EFRAIN RAMIREZ AND LAURA RAMIREZ, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. AMSTED INDUSTRIES, INC., DEFENDANT-APPELLANT, AND NATIONAL MACHINERY EXCHANGE, AMERACE ESNA, GLAUBINGER MACHINE COMPANY, ZAMAX MANUFACTURING CO., INC., RICHFIELD TOOL AND MACHINE COMPANY AND THE XYZ CORPORATION, SAID NAME BEING FICTITIOUS, DEFENDANTS.

Argued November 3, 1980—Decided June 18, 1981.

334

Norman S. Costanza argued the cause for appellant (*Morrison & Morrison*, attorneys; *Norman S. Costanza* and *Gloria B. Cherry*, on the briefs).

*William Pollack* argued the cause for respondents (*William Pollack*, attorney; *Peter Iannarella*, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This products liability case implicates principles of successor corporation liability. We are called upon to formulate a general rule governing the strict tort liability of a successor corporation for damages caused by defects in products manufactured and distributed by its predecessor. The Appellate Division, in an opinion reported at 171 *N.J.Super.* 261 (1979), devised the following test, based essentially on the holding of the Supreme Court of California in *Ray v. Alad Corp.*, 19 *Cal.*3d 22, 560 *P.*2d 3, 136 *Cal.Rptr.* 574 (1977):

> [W]here, as in the present case, the successor corporation acquires all or substantially all the assets of the predecessor corporation for cash and continues essentially the same manufacturing operation as the predecessor corporation the successor remains liable for the product liability claims of its predecessor. [171 *N.J.Super.* at 278.]

In affirming the judgment below we adopt substantially this test for determining successor corporation liability in the factual context presented.

I

On August 18, 1975 plaintiff Efrain Ramirez was injured while operating an allegedly defective power press on the premises of his employer, Zamax Manufacturing Company, in Belleville, New Jersey. The machine involved, known as a Johnson Model 5, sixty-ton punch press, was manufactured by Johnson Machine and Press Company (Johnson) in 1948 or 1949. As a result of. the injuries sustained plaintiffs filed suit against Amsted Industries, Inc. (Amsted) as a successor corporation to Johnson, seeking to recover damages on theories of negligence, breach of warranty and strict liability in tort for defective

design and manufacturing.[1] After discovery had been complet-
ed, Amsted moved for summary judgment on the ground that
the mere purchase of Johnson's assets for cash in 1962 did not
carry with it tort liability for damages arising out of defects in
products manufactured by Johnson. The trial court granted
summary judgment for Amsted, holding that there is no as-
sumption of liability when the successor purchases the predeces-
sor's assets for cash and when the provisions of the purchase
agreement between the selling and purchasing corporations indi-
cate an intention to limit the purchaser's assumption of liability.
That holding was consistent with the traditional rule governing
the liability of successor corporations. See *McKee v. Harris-
Seybold Co.*, 109 *N.J.Super.* 555 (Law Div.1970), aff'd 118 *N.J.
Super.* 480 (App.Div.1972).

On their appeal to the Appellate Division plaintiffs argued
that a corporation that purchases the assets of a manufacturer
and continues the business of the selling corporation in an
essentially unchanged manner should not be allowed to use
exculpatory contractual language to avoid liability for contin-
gent personal injury claims arising out of defects in the prede-
cessor's product. The Appellate Division agreed and reversed
the trial court. Although it recognized that the purchase agree-
ment manifested a clear intent to negate any assumption of
liability by Amsted for contingent product claims, the court
below took notice of "[t]he recent trend towards a rule imposing
liability on the successor corporation without regard to the
niceties of corporate transfers where the successor has acquired
and has continued the predecessor's commercial activity in an
essentially unchanged manner." 171 *N.J.Super.* at 269–70.
Taking cognizance of New Jersey's position "in the vanguard"

---

[1] Plaintiffs' complaint also named as defendants various distributors of the
Johnson power press, alleging the same theories of recovery plus negligent
inspection. We were informed at oral argument that all claims against these
parties have been either settled or dismissed and that Amsted is the sole
remaining defendant.

advancing the principle of enterprise liability and the philosophy of spreading the risk to society for the cost of injuries from defective products, the Appellate Division reasoned that the result in this troublesome area of products liability law should not be controlled by the form of the corporate transfer nor by exculpatory language in the purchase agreement. *Id.* at 275–76. It concluded that because Amsted ultimately acquired all or substantially all the assets of Johnson and continued essentially the same manufacturing operation, Amsted could not as a matter of law avoid potential liability for injuries caused by defects in the Johnson product line, notwithstanding an intervening ownership by an intermediate corporation. *Id.* at 278. It therefore remanded the cause for trial. We granted Amsted's petition for certification. 82 *N.J.* 298 (1980).

## II

Defendant's contention in essence is that the question of whether the debts and liabilities of the selling corporation succeed to the corporation that acquires its manufacturing assets should be controlled by the form of the acquisition and the language of the agreement between the selling and purchasing corporations. Amsted urges that although it ultimately acquired the assets of Johnson, the actual manufacturer of the press that allegedly caused plaintiff's injuries, it is not a successor corporation for purposes of assuming responsibility for liability claims arising out of defects in Johnson's products. In evaluating defendant's contentions we must examine the corporate history of Johnson and trace the assets of Johnson's manufacturing business to their ultimate acquisition by Amsted in 1962.

As indicated above, the machine that caused the injury was manufactured in 1948 or 1949 by Johnson Machine and Press Company of Elkhart, Indiana. In 1956 Johnson transferred all of its assets and liabilities to Bontrager Construction Company (Bontrager), another Indiana corporation. Johnson transacted

no business as a manufacturing entity following its acquisition by Bontrager, but Bontrager did retain a single share of Johnson common stock in order to continue the Johnson name in corporate form. Bontrager's primary activity then became the manufacture of the Johnson press line.

By purchase agreement dated August 29, 1962, Amsted acquired all of the assets of Bontrager, including all the Johnson assets that Bontrager had acquired in 1956, plus the one share of Johnson stock. The purchase price was $1,200,406 in cash.[2] The assets purchased by Amsted in the 1962 transaction included the manufacturing plant in Elkhart, which had been operated by Johnson prior to its transfer to Bontrager in 1956. Amsted also acquired all of Bontrager's inventory, machinery and equipment, patents and trademarks, pending contracts, books and records, and the exclusive right to adopt and use the trade name "Johnson Machine and Press Corporation." Bontrager further agreed to "use its best efforts to make available" to Amsted the services of all of its present employees except its three principals, who covenanted not to compete with Amsted for a period of five years.

In addition, the August 1962 agreement provided that Amsted would assume responsibility for certain specified debts and liabilities necessary to an uninterrupted continuation of the business. Included, however, was the following reservation:

> It is understood and agreed that Purchaser shall not assume or be liable for any liability or obligations other than those herein expressly assumed by Purchaser; all other liabilities and obligations of Seller shall be paid, performed and discharged by Seller.

---

[2]Although as noted by the Appellate Division, 171 *N.J.Super.* at 265 "[t]he fate of Bontrager is not revealed by the present record," other courts analyzing the very same corporate transaction have determined that Bontrager distributed the cash proceeds of the transaction to its shareholders and dissolved its inert corporate existence not long thereafter. See *Korzetz v. Amsted Industries, Inc.*, 472 *F.Supp.* 136, 144 (E.D.Mich.1979); *Ortiz v. South Bend Lathe Co.*, 46 *Cal.App.*2d 842, 846, 120 *Cal.Rptr.* 556, 558 (Dist.Ct.App. 1975).

This limitation on the express assumption of liability was further emphasized in another provision of the contract, that Amsted was "not assuming any liability, debt or obligation of [Bontrager] except those expressly required to be assumed * * * under [the] agreement and that [Bontrager] shall continue to be solely responsible for all its other known or unknown liabilities, debts and obligations arising prior or subsequent to the Closing." The purchase agreement likewise addressed the question of repair of defective products:

> *Defective Products.* All machines sold by Seller on or prior to the Closing Date shall be deemed for the purpose of this Section 8 to be products of Seller, and Seller alone shall be responsible, to the extent of the warranties heretofore given by Seller to its customers, for all liability for the correction and repair of defects in material or workmanship thereof involving costs and expenses in excess of $50 per machine. Purchaser agrees to perform the necessary work to correct and repair the defects involved in such claims for and on behalf of Seller, and Seller agrees to assume and pay for the costs and expenses occasioned by such work to the extent of the warranties heretofore given by Seller to its customers * * *.

Thus it is clear that Amsted expressly declined to assume liability for any claims arising out of defects in products manufactured by its predecessors.

Following the 1962 acquisition Amsted manufactured the Johnson press line through its wholly-owned subsidiary, South Bend Lathe, Inc. (South Bend I), in the original Johnson plant in Elkhart. The Bontrager assets assigned by Amsted to South Bend I included the single outstanding share of Johnson common stock that had been transferred to Bontrager in 1956. The corporate existence of Johnson was dissolved in July 1965 pursuant to the Indiana General Corporation Act, with Amsted being the sole shareholder. Prior to the dissolution Amsted's officers had served as the officers and directors of the corporate shell that was Johnson Press.

In September 1965 South Bend I, the Amsted subsidiary that had been manufacturing the Johnson product line, was dissolved and its assets and liabilities were assumed by Amsted. The manufacturing business was operated by Amsted until June 1975, at which time the business was sold to a newly-formed Indiana corporation also named South Bend Lathe, Inc. (South

Bend II). As part of this transaction Amsted agreed to indemnify South Bend II for any losses arising out of machinery manufactured and sold prior to the date of closing. Amsted acknowledges that by virtue of this indemnity agreement, it is responsible for the defense against and payment of any liability claims against South Bend II arising out of any defects in the Johnson product line.

## III

Amsted urges this Court to judge its potential liability for defective Johnson products on the basis of the traditional analysis of corporate successor liability. Although not heretofore treated by this Court the general principle has been accepted in New Jersey that "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct." *Menacho v. Adamson United Co.*, 420 *F.Supp.* 128, 131 (D.N.J.1976) (applying New Jersey law); *Jackson v. N. J. Mfrs. Ins. Co.*, 166 *N.J.Super.* 448, 454 (App.Div.1978); *N. J. Transp. Dep't v. PSC Resources, Inc.*, 175 *N.J.Super.* 447, 454 (Law Div.1980); *Wilson v. Fare Well Corp.*, 140 *N.J.Super.* 476, 484 (Law Div.1976); *McKee, supra,* 109 *N.J.Super.* at 561. See also 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 1722 at 187 (rev. perm. ed. 1973); 19 *Am.Jur.2d Corporations* § 1546 at 922–24 (1965). However, there are four established exceptions to the general rule of corporate successor nonliability in asset acquisitions. Under the traditional approach the purchasing corporation will be held responsible for the debts and liabilities of the selling corporation, including those arising out of defects in the latter's products, where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for

such debts and liabilities. *Menacho v. Adamson United Co.,* *supra,* 420 *F.Supp.* at 131; *Jackson v. N. J. Mfrs. Ins. Co., supra,* 166 *N.J.Super.* at 454; *N. J. Transp. Dep't v. PSC Resources, Inc., supra,* 175 *N.J.Super.* at 453; *Wilson v. Fare Well Corp., supra,* 140 *N.J.Super.* at 484; *McKee, supra,* 109 *N.J.Super.* at 561. In *McKee supra,* which is presently recognized as the seminal New Jersey case on corporate successor liability in the products context, the court added that "[a] fifth exception, sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer." 109 *N.J.Super.* at 561. Courts applying this traditional corporate law approach have examined the nature and consequences of the asset acquisition in order to determine whether successor liability can be imposed upon the purchasing corporation under one or more of the exceptions to the general rule of nonliability.

In recent years, however, the traditional corporate approach has been sharply criticized as being inconsistent with the rapidly developing principles of strict liability in tort and unresponsive to the legitimate interests of the products liability plaintiff. Courts have come to recognize that the traditional rule of nonliability was developed not in response to the interests of parties to products liability actions, but rather to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions, as well as to determine successor corporation liability for tax assessments and contractual obligations of the predecessor. *Turner v. Bituminous Cas. Co.,* 397 *Mich.* 406, 418, 244 *N.W.2d* 873, 878 (1976); see *Cyr v. B. Offen & Co., Inc.,* 501 *F.2d* 1145, 1152 & n. 12 (1st Cir. 1974); *Appelstein v. United Board & Carton Corp.,* 60 *N.J.Super.* 333, 349–53 (Ch.Div.), *aff'd o. b.,* 33 *N.J.* 72 (1960) (finding merger or consolidation in order to insure dissenting stockholders their appraisal rights).

Strict interpretation of the traditional corporate law approach leads to a narrow application of the exceptions to nonliability, and places unwarranted emphasis on the form rather than the

practical effect of a particular corporate transaction. The principal exceptions to nonliability outlined in *McKee, supra,* condition successor liability on a determination of whether the transaction can be labeled as a merger or a de facto merger, or whether the purchasing corporation can be described as a mere continuation of the selling corporation. Traditionally, the triggering of the "de facto merger" exception has been held to depend on whether the assets were transferred to the acquiring corporation for shares of stock or for cash—that is, whether the stockholders of the selling corporation become the stockholders of the purchasing corporation. See *Travis v. Harris Corp.,* 565 *F.*2d 443, 447 (7th Cir. 1977); *Shannon v. Samuel Langston Co.,* 379 *F.Supp.* 797, 801 (W.D.Mich.1974). Under a narrow application of the *McKee* exception of de facto merger no liability is imposed where the purchasing corporation paid for the acquired assets principally in cash. *Id.*

In like manner, narrow application of *McKee's* "continuation" exception causes liability *vel non* to depend on whether the plaintiff is able to establish that there is continuity in management, shareholders, personnel, physical location, assets and general business operation between selling and purchasing corporations following the asset acquisition. See, *e. g., Travis v. Harris Corp., supra,* 565 *F.*2d at 447; *Freeman v. White Way Sign & Maintenance Co.,* 82 *Ill.App.*3d 884, 893–94, 403 *N.E.*2d 495, 502 (App.Ct.1980). Where the commonality of corporate management or ownership cannot be shown, there is deemed to have been no continuation of the seller's corporate entity. *Id.*

When viewed in this light, narrow application of the *McKee* approach to corporate successor liability is indeed inconsistent with the developing principles of strict products liability and unresponsive to the interests of persons injured by defective products in the stream of commerce. The Supreme Court of Michigan has offered this insight:

> To the injured persons the problem of recovery is substantially the same, no matter what corporate process led to transfer of the first corporation and/or its assets. Whether the corporate transaction was (1) a traditional merger accom-

panied by exchange of stock of the two corporations, or (2) a de facto merger brought about by the purchase of one corporation's assets by part of the stock of the second, or (3) a purchase of corporate assets for cash, the injured person has the same problem, so long as the first corporation in each case legally and/or practically becomes defunct. He has no place to turn for relief except to the second corporation. Therefore, as to the injured person, distinctions between types of corporate transfers are wholly unmeaningful. [*Turner v. Bituminous Cas. Co., supra,* 244 *N.W.*2d at 878.]

We likewise refuse to decide this case through a narrow application of *McKee*. The form of the corporate transaction by which Amsted acquired the manufacturing assets of Bontrager should not be controlling as to Amsted's liability for the serious injury suffered by plaintiff some thirteen years after that transaction. We therefore must consider the alternative approaches to successor corporation liability that have been adopted by other reviewing courts in an effort to arrive at the standard most consistent with the principles underlying the New Jersey law of strict products liability.

### IV

In an effort to make the traditional corporate approach more responsive to the problems associated with the developing law of strict products liability several courts have broadened the *McKee* exceptions of "de facto merger" and "mere continuation" in order to expand corporate successor liability in certain situations. See, *e. g., Knapp v. North American Rockwell Corp.,* 506 *F.*2d 361 (3rd Cir. 1974); *Cyr, supra,* 501 *F.*2d at 1152–54; *Shannon, supra,* 379 *F.Supp.* at 801–02; *Turner, supra,* 397 *Mich.* at 422–31, 244 *N.W.*2d at 880–84. See also *N. J. Transp. Dep't v. PSC Resources, Inc., supra,* 175 *N.J.Super.* at 457; *Wilson v. Fare Well Corp., supra,* 140 *N.J.Super.* at 490–93.

The "mere continuation" exception was first expanded by a federal court applying New Hampshire law in *Cyr v. B. Offen & Co., Inc., supra,* 501 *F.*2d at 1152–54. In *Cyr,* two printing press employees were seriously injured in 1969 by the drying ovens of a machine manufactured in 1959 by B. Offen & Company, a sole proprietorship. In 1963 a group of employees of the original manufacturer had formed the defendant corporation, B. Offen &

Company, Inc., and had purchased for cash the drying system of the presses from the executor of the estate of the sole proprietor. The contract of sale between the successor corporation and the predecessor's estate provided for the purchase of the predecessor's good will, contract and service obligations, and the continued operation of the predecessor's business without substantial change. 501 *F.*2d at 1151. The contract expressly disclaimed successor corporation liability for costs incurred by the torts of the predecessor. *Id.* The court held that there was sufficient justification for a jury to treat the successor corporation as the mere continuation of its predecessor for the purposes of imposing tort liability for injuries caused by defective products. *Id.* at 1153–54. It found that the successor corporation continued to produce the same product, through the same employees, in the same physical plant, and under the same supervision as its predecessor, and that by use of essentially the same name held itself out to the world as the same enterprise.

The *Cyr* court based the justification for its holding on the public policy considerations underlying strict products liability. It recognized that the successor corporation, not being the original manufacturer, is not the specific legal entity that placed the defective product in the stream of commerce or made implied representations as to its safety. Nonetheless, there were several other policy justifications for imposing strict products liability on the successor. The first was in essence the risk-spreading approach:

> The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product. [Id. at 1154.]

The court also reasoned that the successor corporation, having reaped the benefits of continuing its predecessor's product line,

exploiting its accumulated good will and enjoying the patronage of its established customers, should be made to bear some of the burdens of continuity, namely, liability for injuries caused by its defective products.

Perhaps the most significant decision expanding the "mere continuation" exception to the traditional rule of corporate successor nonliability is *Turner v. Bituminous Cas. Co.*, 397 *Mich.* 406, 244 *N.W.2d* 873 (1976). The defendant in *Turner* contended that where manufacturing assets are acquired by a purchasing corporation for cash rather than for stock, there is no continuity of shareholders and therefore no corporate successor liability. *Id.* 244 *N.W.2d* at 879. However, the court looked upon the kind of consideration paid for assets as but "one factor to use to determine whether there exists a sufficient nexus between the successor and predecessor corporations to establish successor liability." *Id.* at 880. It reasoned that there was no practical basis for treating a cash purchase of corporate assets any differently from an acquisition of assets for stock, concluding that "[i]t would make better sense if the law had a common result and allowed products liability recovery in each case." *Id.*

Accordingly, the *Turner* court held that in applying the "mere continuation" exception to situations involving the sale of corporate assets for cash, continuity of shareholders between selling and purchasing corporations is not a relevant criterion for the purposes of determining successor liability for injury caused by defective products. Rather, it adopted a less stringent version of the "mere continuation" exception in the sale-of-assets-for-cash context, jettisoning the criterion of continuity of shareholders and emphasizing continuity of the enterprise of the predecessor corporation. 244 *N.W.2d* at 883. Applying the rule it had adopted to the record before it, the court concluded that all relevant elements of continuation were present.

In the instant case plaintiffs contend that Amsted can be held responsible for liability arising out of defective Johnson products

based upon *Turner*'s expanded "continuation" approach. To support this line of attack they rely on *Korzetz v. Amsted Industries, Inc.*, 472 *F.Supp.* 136 (E.D.Mich.1979). In *Korzetz*, a federal court in Michigan applied the *Turner* analysis to the very same corporate succession involved in the instant case (Johnson to Bontrager to Amsted), and determined that Amsted could be held liable for injuries caused by presses manufactured by Johnson well before Amsted acquired the Johnson assets from Bontrager. The court found "strong and convincing evidence of continuity of enterprise" from Johnson to Bontrager to Amsted, not significantly diluted by the facts that Amsted changed its corporate name rather than continue the official corporate names "Johnson" or "Bontrager," that Bontrager continued to exist as a shell for more than two years following the sale of assets to Amsted, that Bontrager's period of ownership intervened between Johnson's and Amsted's, and that Amsted expressly refused to assume liability for breach of warranties on the Johnson machines it purchased from Bontrager. 472 *F.Supp.* at 144. Rather, the court in *Korzetz* emphasized the following evidence of continuity:

> Amsted purchased all of Bontrager's assets: plants, lands, designs, inventories, work in progress, patents, trademark, and customer lists. Also sales representative contracts were to be maintained as well as other than existing contracts. Amsted secured a covenant not to compete for five years from Bontrager's shareholders; Bontrager was to maintain inventory supplies in accordance with prior practice, and real property was transferred with the stipulation that it was to be used for continuing operations; Amsted was to make best effort to take on all of Bontrager's employees with the exception of three management level personnel. We believe this evidence convincingly establishes the type of relationship or continuity of interest envisioned by *Turner*. [*Id.*]

Also of relevance to the court was the fact that Amsted represented its presses as "Johnson Presses" in advertising campaigns and made further efforts "to exploit the Johnson goodwill, name and market." *Id.* *Korzetz* concluded that Amsted was a mere continuation of the manufacturing enterprise that Johnson established, despite the intervening ownership of Bontrager. *Id.* at 144–45.

We agree with plaintiffs that under *Turner,* which simply expands the "continuation" exception to the traditional *McKee* approach, *ante* at 340, Amsted may be held to be the mere continuation of Johnson for the purpose of imposing corporate successor liability for injuries caused by defective Johnson products. However, the Appellate Division actually based its decision below and its ultimate test of successor corporation liability not on the *Turner* analysis but rather on the so-called "product line exception" developed by the California Supreme Court in *Ray v. Alad Corp.,* 19 *Cal.*3d 22, 560 *P.*2d 3, 136 *Cal.Rptr.* 574 (1977), and applied since then in *Gee v. Tenneco, Inc.,* 615 *F.*2d 857 (9th Cir. 1980), and *Rawlings v. D. M. Oliver, Inc.,* 97 *Cal.App.*3d 890, 159 *Cal.Rptr.* 119 (Dist.Ct. App.1979). There are fundamental practical and analytical differences between *Turner*'s expanded "mere continuation" exception and *Ray*'s "product line" approach. *Turner* merely broadens the inroads into the traditional principles of corporate successor nonliability expressed in *McKee* and related cases, while *Ray* completely abandons the traditional rule and its exceptions, utilizing instead the policies underlying strict liability in tort for injuries caused by defective products. Whereas the *Turner* variation on continuation of the enterprise contemplates such factors as the ownership and management of the successor's corporate entity, its personnel, physical location, assets, trade name, and general business operation, the *Ray* test is concerned not with the continuation of the corporate entity as such but rather with the successor's undertaking to manufacture essentially the same line of products as the predecessor.

Because we believe that the focus in cases involving corporate successor liability for injuries caused by defective products should be on the successor's continuation of the actual manufacturing operation and not on commonality of ownership and management between the predecessor's and successor's corporate entities, and because the traditional corporate approach,

even as broadened by *Turner* and its progeny, renders inconsistent results,[3] we adopt substantially *Ray*'s product line analysis.

V

In *Ray v. Alad Corp., supra,* the plaintiff was injured in a fall from a defective ladder on which he had been working. One year prior to plaintiff's injury the manufacturer of the ladder, Alad Corporation (Alad I), had sold to Lighting Maintenance Corporation its assets, stock in trade, trade name and goodwill. As part of the transaction Alad I agreed to dissolve its corporate existence as soon as practical and to assist the purchasing corporation in the organization of a new business entity under the name of Alad Corporation (Alad II). The principal stockholders of Alad I agreed not to compete with .Alad II for forty-two months and to render nonexclusive consulting services during that period. The principal stockholder of Alad I was employed as a salaried consultant for the initial five months of Alad II's organization. Once in operation Alad II continued to manufacture the same line of Alad I ladders, under the same name, using the same equipment, employees and customer lists.

---

[3]For example, in *Hernandez v. Johnson Press Corp.,* 70 *Ill.App.*3d 664, 26 *Ill.Dec.* 777, 388 *N.E.*2d 778 (App.Ct.1979), an Illinois appellate court applied the *Turner* analysis to the very same corporate genealogy as involved herein, and determined that there was no de facto merger between Johnson and Amsted. The court's findings of fact, however, indicate that the plaintiff presented a shamefully weak record, as the court was unable to point to facts indicating continuity of management, personnel, physical location, assets and general business operation. 388 *N.E.*2d at 780. In *Korzetz, supra, Turner's* continuity rationale was applied to the identical factual situation and the court found "strong and convincing evidence of continuity of enterprise" from Johnson to Amsted, emphasizing continuity of personnel, physical location, assets, trade name, sales contract, customer lists, and general business operations. 472 *F.Supp.* at 144. While the record in the present case clearly supports the *Korzetz* court's result, the point is that the *Turner* analysis lends itself to inconsistency and ambiguity. *Ray's* product line analysis, focusing primarily on the continuation of the general business operations, not only can be applied with greater consistency, but better reflects the underlying policy in New Jersey that liability for defective products attaches to the manufacturing enterprise.

No contractual provisions were made for the assumption of liability by Alad II for defects in products manufactured or sold by Alad I prior to the asset acquisition. The injured plaintiff in *Ray* sued Alad II on the theory of strict liability in tort.

The California Supreme Court reversed a trial court's summary judgment in favor of Alad II. It determined that none of the four stated exceptions to the general rule of nonliability under the traditional corporate law approach was sufficient basis for imposing liability on the purchasing corporation, Alad II. 19 *Cal.*3d at 29, 560 *P.*2d at 7, 136 *Cal.Rptr.* at 578. Nevertheless, the court determined that a special departure from that traditional approach was called for by the policies underlying strict tort liability for injuries caused by defective products. Rather than adopt the expanded "mere continuation" exception to the corporate law approach as developed in *Cyr, supra,* and *Turner, supra,* the *Ray* court abandoned the traditional analysis. *Id.* at 30, 560 *P.*2d at 8, 136 *Cal.Rptr.* at 579. It developed instead the following formulation, which has since come to be known as the "product line" approach to successor corporation liability for injuries caused by defective products:

> We * * * conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort, liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired. [19 *Cal.*3d at 34, 560 *P.*2d at 11, 136 *Cal.Rptr.* at 582.]

The *Ray* court offered a three-fold justification for its imposition of potential liability upon a successor corporation that acquires the assets and continues the manufacturing operation of the predecessor:

> (1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. [19 *Cal.*3d at 31, 560 *P.*2d at 9, 136 *Cal.Rptr.* at 580.]

In our view these policy considerations likewise justify the imposition of potential strict tort liability on Amsted under the

circumstances here presented. First, the plaintiff's potential remedy against Johnson, the original manufacturer of the allegedly defective press, was destroyed by the purchase of the Johnson assets, trade name and good will, and Johnson's resulting dissolution. It is true that there was an intermediate transaction involved, namely, the acquisition of the Johnson assets by Bontrager in 1956. But the acquisition of these assets by Amsted in 1962 directly brought about the ultimate dissolution of Bontrager's corporate existence. Accordingly, the Bontrager acquisition destroyed whatever remedy plaintiff might have had against Johnson, and the Amsted acquisition destroyed the plaintiff's potential cause of action against Bontrager. What is most important, however, is that there was continuity in the manufacturing of the Johnson product line throughout the history of these asset acquisitions.

Second, the imposition of successor corporation liability upon Amsted is consistent with the public policy of spreading the risk to society at large for the cost of injuries from defective products. The progressive character of New Jersey decisional law in the area of strict products liability is well known, and its development need not be retraced here. See *Suter v. San Angelo Foundry and Machine Co.*, 81 *N.J.* 150, 169–72 (1979); *Heavner v. Uniroyal, Inc.*, 63 *N.J.* 130, 146–52 (1973). Suffice it to say that this Court has long recognized the significance of the social policy of risk-spreading in establishing the manufacturer's duty to the product user under the rapidly expanding principles of strict liability in tort. See *e. g., Suter, supra*, 81 *N.J.* at 172. In *Santor v. A. M. Karagheusian, Inc.*, 44 *N.J.* 52 (1965), Justice Francis stated for the Court:

> In this developing field of the law, courts have necessarily been proceeding step by step in their search for a stable principle which can stand on its own base as a permanent part of the substantive law. The quest has found sound expression, we believe, in the doctrine of strict liability in tort. Such doctrine stems from the reality of the relationship between manufacturers of products and the consuming public to whom the products are offered for sale. * * * The obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries

\* \* \* resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. [*Id.* at 64–65.]

In essence, Amsted contends that because it had no physical control over the allegedly defective Johnson press when it was placed into the stream of commerce, it is not the maker of the product who put it in the channels of trade. But to argue that a successor corporation can not be liable for injuries arising out of defects in certain products because it is not the same corporate entity that actually manufactured or distributed those products is to beg the underlying question involved in downstream corporate liability cases in the products liability context. No one asserts that Amsted was responsible for actually placing the allegedly defective press into the commercial stream. This was done by Johnson, the original manufacturer. But the injured plaintiff obviously cannot look to Johnson for a recovery of the damages occasioned by the accident involving the defective press. Rather, he looks to a viable successor corporation that continued to manufacture and sell the line of products that injured him. Strict liability for injuries caused by defective products placed into the stream of commerce is "an enterprise liability" *Santor, supra,* 44 *N.J.* at 65, one that continues so long as the defective product is present on the market. See *Suter, supra,* 81 *N.J.* at 169; *Santor, supra,* 44 *N.J.* at 65. The successor corporation that continues the manufacturing enterprise of its predecessor may not have had the means available for avoiding the risk of placing a defective product into the stream of commerce initially, but it does have the means available for avoiding the risk of harm caused by its predecessor's defective products still present on the market.

As stated by Justice Schreiber for the Court in *Suter, supra:*

Strict liability in a sense is but an attempt to minimize the cost of accidents and to consider who should bear those costs. See the discussion in Calabresi & Hirschoff, "Toward a Test for Strict Liability in Torts," 81 *Yale L. J.* 1055 (1972), in which the authors suggest that the strict liability issue is to decide which party is the "cheapest cost avoider" or who is in the best position to make the cost-benefit analysis between accident costs and accident avoidance costs and to act on that decision once it is made. *Id.* at 1060. Using this approach, it is

obvious that the manufacturer rather than the factory employee is "in the better position both to judge whether avoidance costs would exceed foreseeable accident costs and to act on that judgment." *Id.* [81 *N.J.* at 173–74.]

Similarly, because the manufacturer transfers to its successor corporation "the resources that had previously been available to [the manufacturer] for meeting its responsibilities to persons injured by defects in [products] it had produced," *Ray v. Alad, supra,* 19 *Cal.*3d, at 33, 560 *P.*2d at 10, 136 *Cal.Rptr.* at 581, the successor rather than the user of the product is in the better position to bear accident-avoidance costs. By the terms of the 1962 purchase agreement with Bontrager, Amsted acquired the Johnson trade name, physical plant, manufacturing equipment, inventory, records of manufacturing designs, patents and customer lists. Amsted also sought the continued employment of the factory personnel that had manufactured the Johnson presses for Bontrager. "With these facilities and sources of information, [Amsted] had virtually the same capacity as [Johnson] to estimate the risks of claims for injuries from defects in previously manufactured [presses] for purposes of obtaining [liability] insurance coverage or planning self-insurance." *Id.* at 33, 560 *P.* 2d at 10, 136 *Cal.Rptr.* at 581. Amsted was in the same position as its predecessors to avoid the costs and to spread the risk of accident injuries to users of defective Johnson power presses.

 Third, the imposition upon Amsted of responsibility to answer claims of liability for injuries allegedly caused by defective Johnson presses is justified as a burden necessarily attached to its enjoyment of Johnson's trade name, good will and the continuation of an established manufacturing enterprise. See *Ray v. Alad, supra,* 19 *Cal.*3d at 33–34, 560 *P.*2d at 10–11, 136 *Cal.Rptr.* at 581–82. Through acquisition of the Johnson trade name, plant, employees, manufacturing equipment, designs and customer lists, and by holding itself out to potential customers as the manufacturer of the same line of Johnson power presses, Amsted benefited substantially from the legitimate exploitation of the accumulated good will earned by the Johnson product line. See *Korzetz, supra,* 472 *F.Supp.* at 144. Public policy

requires that having received the substantial benefits of the continuing manufacturing enterprise, the successor corporation should also be made to bear the burden of the operating costs that other established business operations must ordinarily bear. See *Cyr, supra*, 501 *F.*2d at 1154; *Shannon, supra*, 379 *F.Supp.* at 802; *Ray v. Alad, supra*, 19 *Cal.*3d 34, 560 *P.*2d at 11, 136 *Cal.Rptr.* at 581. By acquiring all of the Johnson assets and continuing the established business of manufacturing and selling Johnson presses, Amsted "became 'an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.'" *Id.* at 34, 560 *P.* 2d at 11, 136 *Cal.Rptr.* at 582 (quoting *Vandermark v. Ford Motor Co.*, 61 *Cal.*2d 256, 262, 391 *P.*2d 168, 171, 37 *Cal.Rptr.* 896, 899 (1964).

## VI

Defendant contends that the imposition of strict products liability on corporations that purchase manufacturing assets for cash will have a chilling—even a crippling—effect on the ability of the small manufacturer to transfer ownership of its business assets for a fair purchase price rather than be forced into liquidation proceedings. Business planners for prospective purchasing corporations will be hesitant to acquire "a potential can. of worms that will open with untold contingent products liability claims." In order to divest itself of its business assets, the small manufacturing corporation will be forced to sacrifice such a substantial deduction from a fair purchase price that it would lose the ability to net a sum consistent with the true worth of the business assets.

█ These contentions raise legitimate concerns. We do not look upon them as "cassandrian arguments," see *Turner, supra*, 397 *Mich.* at 428, 244 *N.W.*2d at 883; Juenger & Schulman, *Assets Sales and Products Liability*, 22 *Wayne L.Rev.* 39, 57 (1975). However, in light of the social policy underlying the law of products liability, the true worth of a predecessor corporation

must reflect the potential liability that the shareholders have escaped through the sale of their corporation. Thus, a reduction of the sale price by an amount calculated to compensate the successor corporation for the potential liability it has assumed is a more, not less, accurate measure of the true worth of the business.

Furthermore, a corporation planning the acquisition of another corporation's manufacturing assets has certain protective devices available to insulate it from the full costs of accidents arising out of defects in its predecessor's products. In addition to making adjustments to the purchase price, thereby spreading the potential costs of liability between predecessor and successor corporations, it can obtain products liability insurance for contingent liability claims, and it can enter into full or partial indemnification or escrow agreements with the selling corporation. True, the parties may experience difficulties in calculating a purchase price that fairly reflects the measure of risk of potential liabilities for the predecessor's defective products present in the market at the time of the asset acquisition. Likewise do we acknowledge that small manufacturing corporations may not find readily available adequate and affordable insurance coverage for liability arising out of injuries caused by the predecessor's defective products.[4] However, these concerns, genuine as they may be, cannot be permitted to overshadow the basic social policy, now so well-entrenched in our jurisprudence, that favors imposition of the costs of injuries from defective products on the manufacturing enterprise and consuming public rather than on the innocent injured party. In time, the risk-spreading and cost avoidance measures adverted to above should become a normal part of business planning in connection with

[4]The problem of protecting both product users and successor corporations through increased availability of products liability insurance has not escaped legislative attention and may be ripe for more intensive action. See Comment, *Products Liability and Successor Corporations*, 13 *U.Calif.D.L.Rev.*, 1000, 1023–33 (1980).

the corporate acquisition of the assets of a manufacturing enterprise. See *Turner, supra*, 397 *Mich.* at 428, 244 *N.W.*2d at 883.

## VII

■ Defendant further asserts that it is unfair to impose on it liability for defects in a predecessor's product manufactured and placed into the stream of commerce twenty eight years and two corporate transactions before the accidental injury occurred. This argument, however, goes essentially to a question of repose, namely, whether there should be a limitation on the time period during which a party may bring suit for injury arising out of a defective product. As the Appellate Division correctly concluded, only the legislature is authorized to establish a limitation on the period during which suit may be commenced against a manufacturer, its successor, or seller of allegedly defective products. 171 *N.J.Super.* at 277.

■ In this regard, an analogy has been made to *N.J.S.A.* 2A:14–1.1, which specifically provides that no action for an injury arising out of the defective and unsafe condition of an improvement to real property shall be brought against any person performing or furnishing the design or construction of such improvement more than ten years after the performance or furnishing of such services and construction. *See generally O'Connor v. Altus*, 67 *N.J.* 106 (1975); *Rosenberg v. North Bergen*, 61 *N.J.* 190 (1972); *Brown v. Jersey Central Power & Light Co.*, 163 *N.J.Super.* 179 (App.Div.1978), certif. den., 79 *N.J.* 489 (1979); *Hudson County v. Terminal Constr. Corp.*, 154 *N.J.Super.* 264 (App.Div.1977); *Richards v. Union Bldg. and Constr. Corp.*, 130 *N.J.Super.* 127 (App.Div.1974). The statute cuts off all claims after ten years from the time of the performance of the construction, irrespective of the date of injury. *Brown, supra*, 163 *N.J.Super.* at 193. Despite the fact that a cause of action does not accrue until the personal injury or property damage occurs as a result of the defect, see *Heavner v.*

*Uniroyal, Inc., supra,* 63 *N.J.* at 142, the constitutionality of the limitations period in *N.J.S.A.* 2A:14–1.1 has been upheld against claims that it bars causes of action before they arise. See *Rosenberg v. North Bergen, supra,* 61 *N.J.* at 198–201.[5] It has been recognized that this and other similar statutes recently enacted across the country "were meant to cut back on the potential of this group to be subject to liability for life." *Hudson County v. Terminal Constr. Corp. supra,* 154 *N.J.Super.* at 268. With the expanded potential liability of successor corporations for injuries arising out of defects in their predecessors' products, a similar legislative response may be in order with respect to product liability claims.[6]

## VIII

Finally, Amsted contends that a new standard of liability for successor corporations in the acquisition-of-assets-for-cash context should be limited to solely prospective application and not applied to the instant case. The argument, based substantially upon this Court's decision in *Darrow v. Hanover Tp.,* 58 *N.J.* 410 (1971), is that there has been justifiable reliance on earlier New Jersey decisions finding no successor corporation liability where business assets are purchased from a manufacturing corporation for cash. Defendant urges that its corporate business planners relied on the general rule of nonliability as expressed in *McKee*

---

[5]The court in *Rosenberg* determined that *N.J.S.A.* 2A:14–1.1 was valid legislative response to the expanding potential liability of contractors and others involved in creating improvements to real property, brought on by New Jersey's expansion of the discovery rule, see *Fernandi v. Strully,* 35 *N.J.* 434 (1961), and the abandonment of the "compieted and accepted" rule in *Totten v. Gruzen,* 52 *N.J.* 202 (1968).

[6]See *Ramirez, supra,* 171 *N.J.Super.* at 277 & n. 2 (citing *Diamond v. E. R. Squibb & Sons, Inc.,* 366 *So.2d* 122i (Fla.App.1979); [1979] *Prod.Liab.Rep.* (CCH) ¶ 3380; Note, *Limitation of Action: Strict Liability in Tort—The Legislature has Intervened,* 67 *Ill.B.J.* 214 (1968); Note, *When the Product Ticks: Products Liability and the Statute of Limitations,* 11 *Ind.L.Rev.* 693 (1978); Note, *Statutes of Repose in Products Liability: The Assault Upon the Citadel of Strict Liability,* 23 *S.Dak.L.Rev.* 149 (1978)).

and its progeny when drafting the appropriate provisions to be included in the 1962 purchase agreement and in determining what financial protection they would need thereafter to insure against the risk entailed in the liabilities assumed. See *Darrow, supra*, 58 *N.J.* at 415–16. In addition, Amsted argues that insurers providing that protection have relied on the existing state of the law in determining the degree of risk involved and the rates of premiums to charge in providing coverage for injuries caused by defects in the insured corporation's products. *Id.* at 416.

While we agree that there was a reasonable basis for reliance by successor corporations and their insurance carriers on the general rule of nonliability under the *McKee* approach, the plaintiffs in this case should not be denied the reward for their efforts and expense in challenging the traditional corporate law principles expressed by *McKee*. Therefore, we apply the new rule to the present case and its companion, *Nieves v. Bruno-Sherman Corp. and Harris Corp.*, 86 *N.J.* 361. Moreover, we conclude that on balance and as a matter of fundamental fairness, the benefit of today's rule should be extended to other similarly situated plaintiffs with products liability suits against successor manufacturers affected by this rule, which suits were in progress as of November 15, 1979, the date of the Appellate Division decision. There is a basic justness in recognizing that persons who have exercised the initiative to challenge the existing law should be accorded relief if their claims—not yet resolved when the new rule of law is announced—are ultimately vindicated. This is not unfair to defendants in similar asset-acquisition transactions who, except for the handful of cases caught up by the limited retroactive application of today's rule, now have a "cut-off" date of November 15, 1979 for exposure to liability. This limitation on the application of the product-line theory will provide concerned parties the opportunity to adjust their future conduct and relationships, particularly with regard to the procurement of adequate products liability insurance and other available risk-spreading and cost avoidance arrangements.

## IX

■ Under today's determination the *McKee* approach is no longer the standard to be applied in determining the liability of a successor corporation for injuries caused by a defective product manufactured and placed in the stream of commerce by a predecessor. Rather, we hold that where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor. The social policies underlying strict products liability in New Jersey are best served by extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of products as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers. Because there exist genuine issues of material fact as to Amsted's liability under this standard, the Appellate Division's reversal of the trial court's grant of summary judgment to Amsted is affirmed, and the matter is remanded to the Law Division for trial.

Affirmed.

SCHREIBER, J., concurring.

The Court today has fashioned a remedy for persons injured due to a defective product against a successor to the manufacturer of the product, irrespective of the form of that succession. I agree with the functional approach embraced by the majority. The central thesis of this methodology is premised on the elimination by the successor of an effective remedy. That is an essential condition precedent to recovery.

It is with the retrospectiveness of the new rule that I have difficulty. It is inequitable to saddle, as the majority does, all previous purchasers of assets, who have not assumed the liabilities arising out of defects of previously manufactured products, with those liabilities when the accident occurs after November 15, 1979. This injustice is apparent.

A crucial element in a product liability action against a manufacturer is that it placed a defective product in the stream of commerce. Yet here the defendant manufacturer is completely innocent. When its purchase contract was made, it had no responsibility for the product, and it in no way contributed to the accident. (We are not concerned herein with the duty to advise of improvements or subsequently discovered defects.) On the other hand, frequently a plaintiff will not be free of any fault, so that the classic situation concerning which of two innocent parties should bear the loss will often not be present.

Moreover, the purchaser of the manufacturing assets has entered into a contract in good faith fully relying upon the law that it would not be responsible for defective products made by the seller. When the price of acquisitions, whether by merger, consolidation or purchase of assets, is determined, the parties in fixing value consider, among other things, the liabilities which the buyer is assuming. One factor motivating acquisition of the seller's assets rather than its securities has been to avoid known and unknown liabilities. See McGaffey, *Buying, Selling, and Merging Businesses* 1–2 (1979); Kadens, "Practitioner's Guide to Treatment of Products Liabilities in Assets Acquisitions," *U.Tol. L.Rev.* 1, 32–44 (1978); Stephan, "Acquisition Trouble Spots," 21 *Bus.Law* 401, 401–402 (1966). Obviously and as the majority recognizes, whether liabilities, contingent or otherwise, are assumed or not has an effect on the purchase price.[1] See *ante* at

---

[1] Interestingly, the Legislature has recognized the legal difference between a transfer of assets with and without an assumption of the seller's liabilities. Compare the requirements when a "bulk transfer" is made and liabilities are not assumed, *N.J.S.A.* 12A:6–103(6), (7), with those when an assumption is

353–354. See also Juenger and Schulman, "Assets Sales and Products Liability," 22 *Wayne L.Rev.* 40, 55–56 (1975).

Lastly, it is unfair to impose the economic monetary consequences on the purchaser. Not only has the purchaser paid more than it would have, it has also been deprived of any opportunity for contractually providing for indemnification from the seller or for some other protective device, such as an escrow. Thus the purchaser will have the cumulative loss of overpaying for the assets and of satisfying the claims of injured persons. Moreover, it is questionable whether purchasers may realistically be able to acquire insurance policies covering them for future accidents caused by defective products made and sold prior to acquisition. See *Senate Select Comm. on Small Business, 28th Annual Rept.,* ch. 18, "Impact of Product Liability on Small Business," 167–171, S.Rept.No. 629, 95th Cong., 1st Sess. (1977); Dep't of Commerce, *Interagency Task Force on Product Liability: Final Report* at VI–2 to VI–38 (1977). For testimony to the effect that 21.6% of those businesses seeking products liability insurance could not obtain it, see *Products Liability Insurance: Hearings Before the Subcomm. on Capital, Investment and Business of the House Comm. on Small Business,* 95th Cong., 1st Sess. (Part 1) 4 (1977). See also Kadens, *supra,* 10 *U.Tol.L.Rev.* at 22–25; Comment, "Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance," *U.Calif.D.L.Rev.* 1000, 1002–1004, 1022–1024 (1980). There is nothing in the record which is of assistance in answering this question. If such a policy may not feasibly be obtainable, the exposures of many small and moderate size companies would be immense. The economic consequences could be disastrous as well as inequitable and unjust.

---

made, *N.J.S.A.* 12A:6–104 to –111. Only creditors of the transferor or seller holding claims based on transactions or events occurring before the bulk transfer are protected. *N.J.S.A.* 12A:6–109.

On the other hand, the injured persons may not have been left totally unrecompensed. Workers' compensation, accident and health insurance policies, and liability of the manufacturer of the defective product or its insurer are some monetary sources which may be available to compensate the injured plaintiff.

An equitable resolution of retrospectiveness should focus on the date of acquisition rather than the date of the accident. Thus only purchasers of assets whose contracts were entered into after November 15, 1979 should be subject to the rule announced today. On balance, I would respect the parties' contracts entered into on or before November 15, 1979 in the absence of some compelling reason to the contrary.

Except as stated herein, I join in the opinion.

SCHREIBER, J., concurring in the result.

For *affirmance*—Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For reversal*—None.

