ATKINS, Senior District Judge,
specially concurring:
While the record does not reflect the fact, this judge takes judicial notice of the procedure, adopted by 44 of the Supreme Courts or comparable final state appellate courts, permitting federal appellate courts to submit questions for resolution by such courts, involving state common law issues that remain “open.” Such procedure cries out for decision in the appeal sub judice. The issue concerns, as the majority opinion so clearly demonstrates, whether this court should hold an entity liable for environmental degradation of land for commercial engrandizement after it obviously profited from such degradation, even though acquisition of land was not part of the product line purchase. This salutary certification procedure avoids the charge, admittedly valid, that the federal courts should avoid extending, gratuitously, the common law of the states within the ambit of their jurisdiction. City of Philadelphia v. Lead Industries Ass’n, 994 F.2d 112 (3d Cir.1993).
Here, we are called upon to decide what, under a new set of facts, the Supreme Court of New Jersey would decide in an issue it has never been called upon to consider. Our problem is complicated by New Jersey’s failure to provide a certification procedure permitting it to have a needed and proper voice in the development of the common law of its state.
A. The Development of New Jersey’s “Product Line” Doctrine
When the district court denied the plaintiffs’ Motion for Summary Judgment, it relied on a string of cases defining the present “product line” theory of successor corporation liability for strict liability torts. From the trend formed by these opinions, the district court “predicted” how the New Jersey Supreme Court would rule under the present factual circumstances. The district court held that the product line doctrine of successor liability originally adopted in Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 431 A.2d 811 (1981), should be applied to include circumstances where a predecessor corporation improperly disposed of toxic manufacturing by-products on its factory site and then sold its entire product line patented process, good will, inventory, sales records and trade name, but not the factory site itself, to a successor corporation which continues the same manufacturing process at different site. Upon review of the line of cases dealing with the “product line” theory of successor corporate liability in products liability cases, I believe that the district court was correct in determining that the New Jersey Supreme Court would apply the strict liability doctrine to a strict liability environmental tort under these factual circumstances.
B. Analysis
This is not a case where the corporate successor purchases some of the land that the predecessor contaminated and then continued a separate business on that land. Therefore, State Dept. of Environmental Protection v. Exxon Corp., 151 N.J.Super. 464, 376 A.2d 1339 (Ch.Div.1977), is distinguishable. This case is, however, more like Ramirez, supra, in that Welsbach’s product line could be considered as all or substantially all of the manufacturing assets which were acquired by Kerr-McGee’s predecessors. Thus, even if the assets were acquired exclusively for cash, and Kerr-McGee and its predecessors undertook essentially the same manufacturing operation as Welsbach, Kerr-McGee should be strictly liable for injuries caused by defects in units or by waste from production of those units of the same product line, even if previously manufactured and distributed by Welsbach. See Ramirez, 431 A.2d at 825.
*103 The policies in Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977), and Ramirez, supra, apply similarly to the present case. First the plaintiffs potential remedy against Welsbach, the original manufacturer who caused the contamination, was destroyed by the Kerr-McGee’s purchase of Welsbach’s assets, trade name, good will and Welsbach’s resulting dissolution. In other words, Kerr-McGee’s acquisition destroyed whatever remedy plaintiff might have had against Welsbach. Second, the imposition of successor corporation liability upon Kerr-MeGee is consistent with the public policy of spreading the risk to society at large for the costs of injuries from contamination due to a product line. This is because the successor corporation is in a better position to bear accident-avoidance costs. In this case, Kerr-McGee is in a better position to bear the costs because Welsbach transferred to Kerr-McGee the resource that had previously been available to Welsbach for meeting its responsibilities to persons injured by the product line it operated. Third, the imposition upon Kerr-McGee of responsibility to answer claims of liability for injuries allegedly caused by Welsbach’s product line is justified as a burden necessarily attached to its enjoyment of Welsbaeh’s trade name, good will and the continuation of an established manufacturing enterprise. For “[pjublie policy requires that having received the substantial benefits of the continuing manufacturing enterprise, the successor corporation should also be made to bear the burden of the operating costs that other established business operations must ordinarily bear.” Ramirez, 431 A.2d at 822. “[I]n light of the social policy underlying the law of products liability, the true worth of a predecessor corporation must reflect the potential liability that the shareholders have escaped through the sale of their corporation.” Id. To avoid such liability Kerr-McGee could have “obtain[ed] products liability insurance for contingent liability claims, and it [could have entered] into full or partial indemnification or escrow agreements with the selling corporation.” Id. 431 A.2d at 823; see La Pollo v. General Electric Co., 664 F.Supp. 178 (D.N.J.1987).
Kerr-McGee, like Bruno in Nieves v. Bruno Sherman Corp., 86 N.J. 361, 431 A.2d 826 (1981), was able “to gauge the risks of injury from defects in the [Welsbach] product line and to bear the accident-avoidance costs,” since Kerr-MeGee was intimately familiar with the production of gas mantles and the unavoidable thorium manufacturing waste. Id. 431 A.2d at 830. Evidence to support this conclusion is found by Lindsay’s acquisition of all the assets and sources of information related to the Welsbach product line. The liability also should apply to Kerr-MeGee because Kerr-McGee’s “acquisition of the business assets and manufacturing operation of [Welsbach] contributed to the destruction of the plaintiffs remedies against the original manufacturer”—Welsbach. Id. 431 A.2d at 831. Finally, like State Dept. of Environmental Protection v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983), I believe that this Court should follow the New Jersey Supreme Court’s application of strict liability in environmental torts, see Department of Transportation v. PSC Resources, Inc., 175 N.J.Super. 447, 419 A.2d 1151 (Law Div.1980), and apply product line strict liability to this environmental tort.
The district court in this case “predicted” that the New Jersey Supreme Court would apply the Ramirez successor corporation strict liability product line doctrine to strict liability environmental actions. Since this is an issue of first impression in New Jersey, the district court truly was “predicting” the result. Hence, if permitted to prognosticate, I too would hold that the New Jersey Supreme Court would apply the doctrine of strict liability to this environmental case and thus affirm the district court. However, while I believe that the decision to apply the doctrine to environmental cases should be left in the hands or the highest state court, there is no method to certify such a question to the court.
C. The Restraint of City of Philadelphia
Despite my firm conviction that the district court should be affirmed, I am constrained by the philosophical tenet of this court in City of Philadelphia, supra, which I respect and adopt. We are not appointed to be activists but to interpret and apply the law as we see it. However, I believe that a dangerous precedent will be set if this court continues down the path which prohibits direct *104 application of state doctrines. Primarily, the removal and jurisdictional statutes will be used as a sword to prevent final resolution of a state claim. For example, where a defendant realizes that the state’s highest court has not ruled on their specific factual circumstance, but has developed a doctrine that might be adverse to that defendant, then the defendant will most assuredly remove the case to federal court knowing that, on appeal, the circuit court will grant summary judgment in their favor based on City of Philadelphia. The result will create an atmosphere where state rights will never be vindicated and cases will not proceed to their ultimate conclusion.
Accordingly and reluctantly, I join the majority remanding this matter to the district court for entry of a summary judgment in favor of Kerr-McGee.