**Steven Lee YOUNG and Tammy Young, Appellants,**

v.

**FULTON IRON WORKS COMPANY, Respondent.**

**No. 14042.**

Missouri Court of Appeals, Southern District, Division Two.

April 28, 1986.

Motion for Rehearing or Transfer Denied May 20, 1986.

Application to Transfer Denied June 17, 1986.

Thomas Strong, John Wooddell, Strong, Placzek & Wooddell, P.C., Springfield, for appellants.

B.H. Clampett, Charles F. Kiefer, Jr., Daniel, Clampett, Rittershouse, Lilley, Dalton, Powell & Cunningham, Springfield, for respondent.

CROW, Judge.

The issue in this appeal is whether Fulton Iron Works Company ("Fulton") is immune from liability for an injury that occurred when a mechanical press manufactured by Ferracute Machine Company ("Ferracute") allegedly "malfunctioned," causing Steven Lee Young ("Steven") to suffer amputation of his right arm below the elbow. Steven and his wife, Tammy, sued Fulton, claiming that Steven's injury was a direct and proximate result of "the defective and unreasonably dangerous condition" of the press, and that Fulton was liable because it "is the corporate successor in interest" to Ferracute.

The trial court, on the basis of the pleadings, stipulations, and discovery, found that Fulton is not the corporate successor in interest to Ferracute, and granted summary judgment in favor of Fulton. The Youngs ("plaintiffs") appeal.

The pertinent facts, as best we are able to glean them from the record furnished us, are set out in chronological sequence.

Ferracute, a New Jersey corporation, began manufacturing mechanical presses in 1903. The press involved in this litigation was manufactured in Bridgeton, New Jersey, in 1926 and, on October 20 of that year, was shipped to Burroughs Adding Machine Company ("Burroughs"), Detroit, Michigan. The press is hereafter referred to by its serial number, 17140.

Although the details are sketchy, it appears that Ferracute became insolvent in the 1930's and "went out of business." A group of investors headed by one George

Bass evidently formed a corporation, chartered by New Jersey on July 30, 1937, which was allowed to carry the Ferracute name. The new Ferracute corporation "purchased the assets" of the original Ferracute corporation "from a bankruptcy court in Atlantic City," and commenced business on August 4, 1937, manufacturing mechanical presses bearing the Ferracute name.

Around 1960, Ferracute acquired the assets of A.B. Farquhar Company, which had been "in the hydraulic press business." Ferracute then began manufacturing hydraulic presses, using the trade name "Farquhar" for them. Ferracute continued to manufacture mechanical presses labeled with the name "Ferracute."

Press 17140, the one involved in this case, remained the property of Burroughs for over 40 years, then, on January 30, 1967, it was sold to Macamo Casket Company ("Macamo") of Marshfield, Missouri, and shipped there.

In 1968, Fulton, a Delaware corporation which had been "in business" in Missouri since 1852,[1] and which had been engaged in the manufacture of machinery used in processing sugar cane since 1890, began seeking another product line that could be manufactured in its St. Louis plant. Harold E. Miller ("Miller"), then Fulton's vice president, was assigned the task of finding such a product.

Miller began negotiating with George Bass, president of Ferracute, to purchase the Ferracute mechanical press and the Farquhar hydraulic press lines from Ferracute. The negotiations, "in almost every instance," were conducted at Ferracute's headquarters in Bridgeton, New Jersey.

The discussions culminated in an "asset purchase agreement," signed April 22, 1968, by representatives of Fulton and Ferracute. Miller recalled that the transaction was closed and the necessary documents were executed at a private club in Philadelphia, Pennsylvania, to which Bass belonged.

Assets of Ferracute purchased by Fulton included: (1) the trademarks and trade names "Ferracute" and "Farquhar," and all patents relating to Ferracute or Farquhar presses still in force, (2) engineering drawings, specifications, and details necessary to produce such presses, (3) sales literature, production records, and other Ferracute records as Fulton might select, (4) jigs and fixtures used or usable for the production of Ferracute or Farquhar presses, (5) one completed "Show Press," and (6) the "stores inventory" located at Ferracute's plant at Bridgeton, New Jersey. Additionally, Ferracute and Bass covenanted not to engage in the production or sale of presses for four years, and Ferracute promised to change its corporate name to one that did not include the words "Ferracute," "Farquhar," or "Press."

Assets of Ferracute not purchased by Fulton included: (1) Ferracute's office building, production plant, pattern shop, and about 10 acres of real estate, (2) machine tools such as boring mills, lathes, grinders, and gear-making machinery, and (3) office furniture and equipment.

Additionally, Ferracute was manufacturing a number of presses that were already under contract at the time it entered into the agreement with Fulton. Ferracute retained the right to complete the work in progress, amounting to "about a year's production," totaling "probably five hundred thousand dollars worth of business." Ferracute did not, however, enter into any new contracts to manufacture or sell any more machines after the Fulton transaction.

On April 29, 1968, a week after the asset purchase agreement was signed, Ferracute, with the consent of all of its shareholders, changed its corporate name to Bridgeton

---

**1.** Evidence showed that Fulton began as a "contract mechanic shop," repairing steamboats on the Mississippi River. That activity was "where the name Fulton came along."

Machine Company ("Bridgeton"). The certificate of amendment was filed and recorded May 2, 1968, in the office of the Secretary of State of New Jersey.

In 1967, the year preceding the transaction between Fulton and Ferracute, Ferracute had between 40 and 50 employees. Only one Ferracute employee, a "salesman" who was "familiar mainly with hydraulic presses," transferred from Ferracute to Fulton in connection with the 1968 asset purchase agreement. All other Ferracute employees remained with Ferracute. Bass had no role in Fulton before or after the 1968 transaction, and no member of the Ferracute board of directors became a director of Fulton.

Bridgeton (formerly Ferracute) completed the work in progress, then sold its equipment "to a used machinery dealer from New York." Bridgeton thereafter sold its real estate and buildings,[2] and, on May 16, 1969, filed a "certificate of dissolution" with the Secretary of State of New Jersey. Asked why Bridgeton went out of business, Bass replied, "I was sixty five years of age and I couldn't find anybody else to buy the whole thing as it was."

In August, 1971, by virtue of an exchange of shares of Fulton stock for shares of stock in Katy Industries, Inc., Fulton "became a subsidiary" of Katy.

On September 9, 1982, Steven, employed by Macamo as a press operator at its Marshfield, Missouri, plant, was allegedly operating press 17140. According to plaintiffs' petition, the press "cycled unexpectedly," catching Steven's right hand and arm, causing the injury described earlier.

One count of plaintiffs' petition avers that press 17140—manufactured by Ferracute some 56 years before Steven's injury—was, in sundry respects, unreasonably dangerous when put to a reasonably anticipated use. That count, say plaintiffs, pleads "strict liability in tort." Another count pleads that Ferracute, in a multitude of respects, was negligent in the design and manufacture of press 17140.

Plaintiffs, as we read their petition, do not contend that Fulton itself was ever guilty of any tortious act or omission that would render Fulton independently liable for Steven's injury. Instead, plaintiffs' theory of liability against Fulton, as we comprehend their petition and their brief, is that by reason of the 1968 transaction between Fulton and Ferracute, Fulton "is legally responsible for the tortious acts of Ferracute."

Plaintiffs' first assignment of error states:

"The trial court erred in granting [Fulton's] motion for summary judgment (therein holding that Fulton was not liable for the press made by [Ferracute]) because New Jersey law should be applied to determine Fulton's liability as a corporate successor and, under the established New Jersey rule, Fulton is liable because it continued to manufacture Ferracute's 'product line' of punch presses."

In their brief, plaintiffs concede that Missouri law "will govern the theories of tort liability and recovery." By that, we understand plaintiffs to say that whether press 17140 was unreasonably dangerous, and whether it was negligently designed or manufactured, will be decided under Missouri law. Nonetheless, plaintiffs insist that whether Fulton must shoulder the liability, if any, for Steven's injury is to be determined under New Jersey law. The New Jersey law on that issue, according to plaintiffs, is set forth in *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811, 824–25[8] (1981), where it is said:

"[W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation

---

**2.** Bass explained that the real estate and buildings were sold three times, the low price being around $50,000 and the high price being around $75,000.

as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor."

It is evident that the trial court in the instant case, in entering summary judgment for Fulton, made no finding as to whether plaintiffs could make a submissible case that press 17140 was unreasonably dangerous, or whether plaintiffs could make a submissible case that press 17140 was negligently designed or manufactured. The trial court based its judgment on the narrow ground that, under the pleadings and evidence before it, Fulton could not be held liable for Steven's injury because (a) there was no allegation that Fulton itself was at fault, and (b) as a matter of law, Fulton was not chargeable with any liability that might have been attributed to Ferracute for Steven's injury.

Accordingly, in our review, we limit our consideration to the issue whether, on the record before the trial court, Fulton is exempt from legal responsibility for such liability, if any, as Ferracute might have had to bear for Steven's injury, were Ferracute still in existence.

In support of their first point, plaintiffs assert that whether Fulton can be held liable depends upon "the legal effect of the 1968 agreement for the sale of assets" by Ferracute to Fulton, and that "[t]his is a contracts question." Consequently, say plaintiffs, the issue "should be decided in accordance with Missouri contract choice of law rules." Plaintiffs contend that under those rules, New Jersey substantive law applies because (1) the 1968 agreement between Fulton and Ferracute "was almost exclusively negotiated in New Jersey," (2) payment and performance took place in New Jersey, (3) the subject matter of the contract was the sale of Ferracute, a company which had existed in New Jersey since 1903, and (4) the selling party was a New Jersey corporation.

In our view, item "(2)" of plaintiffs' argument is factually questionable. As noted earlier, Miller testified that the transaction was closed and the necessary documents were executed in Philadelphia. Additionally, the asset purchase agreement required that payment be made "by a certified, or bank cashier's or treasurer's, check payable in Philadelphia Clearing House funds." While the tangible assets purchased by Fulton were undeniably located in New Jersey, we cannot, on the record before us, say conclusively that "payment and performance" of the Fulton-Ferracute agreement took place exclusively in New Jersey.[3]

Additionally, item "(3)" of plaintiffs' argument, in our view, is misleading, as the subject matter of the Fulton-Ferracute agreement was the sale of certain *assets* of Ferracute, not the sale of Ferracute itself.

We need not, however, dwell on those observations, as they would be relevant—if at all—only if we were required to apply Missouri *contract* choice of law rules in deciding whether Fulton's liability is to be determined by Missouri substantive law or New Jersey substantive law. For the reasons that follow, we reject plaintiffs' contention that the question whether to apply Missouri or New Jersey law in determining Fulton's liability is to be resolved by Missouri *contract* choice of law rules.

*Ramirez*, the New Jersey case relied on by plaintiffs as establishing the New Jersey "product line" corporate successor liability rule, did not apply *contract* choice of law rules (or, for that matter, *any* choice of law rules) in deciding which state law to

---

**3.** Plaintiffs contend that if Missouri *contract* choice of law rules compel us to apply Pennsylvania substantive law in determining whether Fulton can be held liable, the result would be the same as under the New Jersey *Ramirez* rule.

Plaintiffs proclaim that Pennsylvania "adopted the product line rule" in *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981), "relying heavily on the *Ramirez* decision."

follow in determining whether the successor corporation there was liable for damages caused by a machine manufactured by a predecessor. In *Ramirez*, a press was manufactured about 1948 in Indiana by Johnson Machine and Press Company. In 1956, Johnson transferred all of its assets and liabilities to Bontrager Construction Company, another Indiana corporation. Johnson engaged in no manufacturing after its acquisition by Bontrager, but Bontrager did retain one share of Johnson stock in order to continue the Johnson name in corporate form. Bontrager's primary activity became the manufacture of the Johnson press line. In 1962, Amsted Industries, Inc., acquired all of Bontrager's assets, including all the Johnson assets Bontrager had acquired in 1956. Among them was the manufacturing plant in Indiana which had been operated by Johnson prior to the transfer to Bontrager. The 1962 agreement between Bontrager and Amsted provided that except for certain specified debts and liabilities necessary to an uninterrupted continuation of the business, Amsted did not assume any liabilities or obligations of Bontrager. The Supreme Court of New Jersey in *Ramirez* found that Amsted expressly declined to assume liability for any claims arising out of defects in products manufactured by its predecessors. 431 A.2d at 814.

After the 1962 acquisition, Amsted, through a wholly owned subsidiary, manufactured the Johnson press line in the original Johnson plant in Indiana. The corporate existence of Johnson was dissolved in 1965 under Indiana law, Amsted being the sole shareholder. Later in 1965, the Amsted subsidiary that had been manufacturing the Johnson product line was also dissolved, and its assets and liabilities were assumed by Amsted, which operated the business for the next 10 years. In 1975, Amsted sold the business to a newly formed Indiana corporation, and as part of that transaction, Amsted agreed to indemnify the buyer for any losses arising out of machinery manufactured and sold prior to the date of closing. Later in 1975, an employee of Zamax Manufacturing Company, while operating the 1948 Johnson press on the Zamax premises in New Jersey, was injured. The injured worker filed suit against Amsted as a successor corporation to Johnson, seeking damages on theories of negligence, breach of warranty, and strict liability in tort. The trial court granted summary judgment for Amsted; the injured worker appealed.

Despite all the events that had occurred in Indiana, the Supreme Court of New Jersey, in its opinion in *Ramirez*, did not acknowledge any need to determine whether Indiana or New Jersey substantive law applied in deciding whether Amsted was liable to the injured worker. Apparently, New Jersey's only connection with the case was that the injury occurred there. As a preface to adopting the "product line" rule of successor corporate liability, the opinion stated:

> "The form of the corporate transaction by which Amsted acquired the manufacturing assets of Bontrager should not be controlling as to Amsted's liability for the serious injury suffered by plaintiff some thirteen years after that transaction. We therefore must consider the alternative approaches to successor corporation liability that have been adopted by other reviewing courts *in an effort to arrive at the standard most consistent with the principles underlying the New Jersey law of strict products liability.*" 431 A.2d at 816–17. (Emphasis added.)

In the instant case, plaintiffs would have us (a) apply Missouri *contract* choice of law rules in deciding whether to follow Missouri substantive law or New Jersey substantive law in determining whether Fulton can be held liable to plaintiffs, and (b) find, on the basis of Missouri *contract* choice of law rules, that the New Jersey "product line" rule in *Ramirez* applies, thereby rendering Fulton liable to plaintiffs for any damages caused by press 17140.

Plaintiffs insist this is the correct course for us to follow, even though the Supreme Court of New Jersey, in adopting the "product line" rule in *Ramirez*, did not apply the *contract* law of either Indiana or New Jersey.

While it might have been true (though we need not decide) that in a dispute between Fulton and Bridgeton arising from the 1968 asset purchase agreement, Missouri *contract* choice of law rules would have required application of New Jersey *contract* law, we find no merit in plaintiffs' notion that in deciding whether Fulton is immune from *tort* liability to plaintiffs, we must utilize Missouri *contract* choice of law rules to see whether Missouri or New Jersey law applies.

Neither plaintiffs nor Fulton cite a Missouri case addressing this subject, and our research has failed to uncover one. There are, however, cases from other jurisdictions that have decided the question.

In *Barron v. Kane and Roach, Inc.*, 79 Ill.App.3d 44, 34 Ill.Dec. 569, 398 N.E.2d 244 (1979), a New York corporation manufactured a machine in 1960. The machine was sold through an Illinois machinery broker to a company in Illinois. In 1961, a Pennsylvania corporation purchased certain assets of the New York corporation, including the product line of the subject machine. The New York corporation, however, retained its building. Thereafter, a worker using the machine in Illinois was injured. He sued, among others, the New York corporation, the Illinois machinery broker, and the Pennsylvania corporation. The machinery broker ultimately settled with the worker, then filed a third party complaint against the Pennsylvania corporation, seeking to recoup the amount of the settlement. The trial court entered summary judgment in favor of the Pennsylvania corporation.

In affirming the judgment, the Appellate Court of Illinois began by determining whether Illinois or Pennsylvania substantive law applied to the issue of corporate successor liability. The machinery broker pointed to a provision in the contract between the New York corporation and the Pennsylvania corporation which provided that the contract was to be construed according to Pennsylvania law. Therefore, argued the machinery broker, the Pennsylvania law of corporate successor liability should apply. The *Barron* court disagreed, stating:

> *"The question of successor liability has little to do with construing the provisions of the contract.* As aptly pointed out by defendant, even [the machinery broker] admits in its brief that *its claim does not 'arise under the provisions of this agreement [but] out of strict tort liability based on common law theories of successor corporation product liability.'* The question before us, namely [the Pennsylvania corporation's] liability for injuries sustained by a user [of] a product manufactured by its predecessor, is unrelated to a construction of the provisions of the contract. That question of traditional tort law is to be determined in accordance with the law of Illinois, the situs of the injury and the domicile of the injured party." 34 Ill.Dec. at 571[1], 398 N.E.2d at 246[1]. (Emphasis added.)

The *Barron* court, pointing out that in an earlier case, *Domine v. Fulton Iron Works and Bridgeton Machine Co.*, 76 Ill.App.3d 253, 32 Ill.Dec. 72, 395 N.E.2d 19 (1979),[4] it had declined to adopt the "product line" approach to successor liability, applied established Illinois law to the successor liability issue, and held that the Pennsylvania corporation was not liable. *Barron*, 34 Ill.Dec. at 572, 398 N.E.2d at 247.

In *Hickman v. Thomas C. Thompson Co.*, 592 F.Supp. 1282 (D.Colo.1984), a Colo-

---

**4.** *Domine,* interestingly enough, deals with the 1968 asset purchase agreement between Fulton and Ferracute involved in the instant case.

rado resident allegedly developed lead poisoning from certain enameling products she had begun using in 1972. The products were manufactured by Thomas C. Thompson Co. ("TCT") until 1981. Then, pursuant to a contract signed and executed in Illinois, TCT's operations were acquired by Ceramic Coating Co. ("CCC"). The victim brought a "strict liability tort claim" against CCC for injuries caused by products it had manufactured, and by products TCT had manufactured before 1981.

The court determined that if CCC's liability was to be decided under Colorado substantive law, the "product line" rule would apply. However, if CCC's liability was to be decided under Illinois substantive law, the "product line" rule would not apply, as it had been rejected in Illinois by *Domine*, 76 Ill.App.3d 253, 32 Ill.Dec. 72, 395 N.E.2d 19. Consequently, the court found it necessary to determine which rule Colorado would apply. On that issue, the court began by noting that under Colorado conflicts of law rules, successor liability is determined under the law of the state in which the contract for sale of the business arose. *Hickman*, 592 F.Supp. at 1286. However, the court went on to say:

> "The product line exception, as I view it, applies *only as an extension of strict liability in tort law.* It does not apply in the context of contract or other tort liability of successor corporations. *Thus, successor liability, at least in the context of strict liability tort claims, is a tort problem not a contract problem.*" *Id.* at 1286[3]. (Emphasis added.)

The court, finding that Colorado had the most significant contacts to the *tort*, ruled that CCC's liability would be determined under Colorado substantive law, thus the "product line" rule applied.

Perhaps the most incisive analysis of the choice of law problem is *Litarowich v. Wiederkehr*, 170 N.J.Super. 144, 405 A.2d 874 (1979). There, a snowblower was manufactured in Iowa in 1966 by an Iowa corporation, The Eska Company ("Eska-Iowa"). In 1969, Talley Industries, Inc. ("Talley"), a publicly traded Delaware corporation headquartered in Arizona, purchased the assets of Eska-Iowa. Talley then formed a subsidiary under Delaware law to receive the assets of Eska-Iowa. The subsidiary, also named The Eska Company, is henceforth referred to as "Eska-Delaware." Eska-Delaware continued the business previously engaged in by Eska-Iowa. In 1976, a minor was injured in New Jersey while using the 1966 snowblower. The minor sued several parties, including Eska-Iowa, Talley, and Eska-Delaware. Talley and Eska-Delaware moved for summary judgment, arguing that they could not be held liable for an injury caused by a snowblower made by Eska-Iowa.

In selecting which state's substantive law to apply in deciding the liability issue as to Talley and Eska-Delaware, the court noted that the agreement between Eska-Iowa and Talley contained a provision that it was to be interpreted according to Delaware law. The court acknowledged that those two companies were free to shape the consequences of their transaction and to choose a body of law to govern it. 405 A.2d at 876 n. 7. However, said the court:

> "The present case is about a New Jersey injury to a New Jersey resident caused by a snowblower manufactured for interstate sale and sold to a New Jersey retailer. New Jersey's contacts and interest are plain, .... Delaware's interest is not so clear. It seems little more than an interest in the interstate sanctity of protective corporate laws. Iowa and Arizona have as much interest in Delaware corporations that physically operate there. The corporate parties chose a body of local law to govern themselves, but they cannot thereby shut out a tort claimant whose concerns were unrepresented in the acquisition arrangements.
>
> The real interest opposing application of the law of the state of residence and injury is not the interest of another state.

It is the interest of the involved corporations in having an identifiable and reliable body of law by which to order their affairs. Corporate planners want to know when an acquisition will include contingent product liabilities and when it will not. Plans for escrows and indemnities can be made. The acquisition price may be affected. But it is more important that a worker's or consumer's cause of action for product fault not disappear in the shuffling of corporate papers and the invocation of protective foreign law.

[Eska-Iowa] chose to sell its products in New Jersey, among other states. It subjected itself to New Jersey's view of what tort law was necessary to protect its workers and consumers. One who buys Eska's physical assets and operates a business with them is similarly subject to New Jersey's view of what is necessary to protect its workers and consumers. Predictability in corporate transactions may be desirable. But, it does not weigh heavy against the need for a meaningful remedy for an injured person with a valid cause of action for product fault." 405 A.2d at 877–78.

Having said that, the court held that in determining whether Talley and Eska-Delaware could be held liable, New Jersey substantive law would be applied because New Jersey had an interest greater than the state of incorporation or the state where the corporations physically operated.

■ We are persuaded by *Barron, Hickman,* and *Litarowich* that in deciding whether to apply New Jersey or Missouri substantive law in determining whether Fulton can be held liable to plaintiffs, we should follow the Missouri *tort* choice of law rule, not Missouri *contract* choice of law rules. In reaching that conclusion, we do not ignore two cases cited by plaintiffs that have, in resolving the issue of tort liability of a successor corporation for an injury allegedly caused by a defective product made by a predecessor, applied the law of corporate successor liability of the state

where the transaction between the selling and the purchasing corporations took place, rather than the law of the state where the injured party was domiciled and the injury occurred.

One such case is *Standal v. Armstrong Cork Co.,* 356 N.W.2d 380 (Minn.App.1984). In that case, however, the Court of Appeals of Minnesota did not apply Minnesota *contract* choice of law rules, but simply a general "choice of law analysis" containing five "choice-influencing considerations."

The other case, *Bonee v. L & M Construction Chemicals,* 518 F.Supp. 375 (M.D.Tenn.1981), is the only one in which the court applied the *contract* choice of law rule of the state where the injury occurred in determining which state law would govern the issue of the successor corporation's liability for an injury allegedly caused by a defective product made by a predecessor. We have carefully studied *Bonee,* but find that, on this issue, *Barron, Hickman,* and *Litarowich* are more persuasive. We shall therefore look to the Missouri *tort* choice of law rule for guidance as to whether Fulton's liability to plaintiffs shall be governed by the New Jersey or Missouri substantive law of corporate successor liability.

■ In *Kennedy v. Dixon,* 439 S.W.2d 173, 184[6] (Mo. banc 1969), the Supreme Court of Missouri adopted the rule of Restatement (Second) of Conflict of Laws § 145 (1971) for determining the substantive law to be applied in *tort* cases. *Elmore v. Owens-Illinois, Inc.,* 673 S.W.2d 434, 436 (Mo. banc 1984). Restatement § 145 provides:

"(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to deter-

mine the law applicable to an issue include:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue."

Restatement § 6 provides:

> "(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied."

The first of the "contacts" to be taken into account under Restatement § 145(2) is item "(a)," the place where the injury occurred. In the instant case, that, of course, is Missouri.

The second "contact" listed in § 145(2) is item "(b)," the place where the conduct causing the injury occurred. Although it is arguable that this was New Jersey, the state where press 17140 was manufactured, plaintiffs make no such contention. Instead, their petition alleges "[t]he tortious acts committed by Fulton which are described in this Petition were committed in the state of Missouri."

The third "contact" to be taken into account under § 145(2) is item "(c)," the domicile, residence, nationality, place of incorporation, and place of business of the parties. It is readily inferable that plaintiffs are residents of Missouri. As to Fulton, plaintiffs' petition alleges that its "principal place of business is located at 3844 Walsh Street, St. Louis, Missouri." Since the 1968 transaction with Ferracute, Fulton has manufactured the Farquhar and Ferracute press lines at Fulton's St. Louis plant. Fulton, as already noted, is a Delaware corporation.

The final "contact" specified in § 145(2) is item "(d)," the place where the relationship, if any, between the parties is centered. Here, the parties had no relationship prior to Steven's injury, and their only relationship now is that they are parties to this suit, which is pending in Missouri.

Applying the factors listed in Restatement § 6(2) to the contacts enumerated above, it is evident that, with respect to the issue of corporate successor liability, Missouri has the most significant relationship to the occurrence and the parties.

Specifically, in regard to factor "(b)" under § 6(2) (the relevant policies of the forum), Missouri has a judicially adopted policy, discussed *infra*, with respect to the liability of a corporation that purchases assets of another corporation. In the instant case, Fulton had been in business in Missouri some 116 years when it purchased the mechanical and hydraulic press lines from Ferracute and began manufacturing them in Missouri. In the years since, Fulton has continued to conduct its business in Missouri, and has had no place of business elsewhere than St. Louis. Missouri, therefore, has an interest in applying its policy on corporate successor liability to Fulton.

As to factor "(c)" under § 6(2), New Jersey, of course, has a policy regarding corporate successor liability (*Ramirez*, 86 N.J.

332, 431 A.2d 811), but we believe that *in the instant case,* Missouri has a greater interest than New Jersey in determining the issue of Fulton's liability to plaintiffs. Bridgeton (formerly Ferracute) is no longer in existence. New Jersey's only possible interest in the issue of Fulton's liability is that the Fulton-Ferracute contract was negotiated in New Jersey and the assets purchased by Fulton were located there. Fulton, according to the record, had no other presence in New Jersey, and plaintiffs have had no connection with New Jersey. Missouri, however, has a considerable interest in determining the issue of Fulton's liability. Fulton has been engaged in business in Missouri since 1852, and plaintiffs, as noted earlier, are Missouri residents.

Regarding factor "(d)" under § 6(2), we believe that a resident of Missouri can justifiably expect that if he is injured by a defective product, the issue whether a corporate successor to the company that manufactured the product can be held liable will be decided by Missouri law, not by the law of a state in which the transaction between the corporations happened to occur. Applying Missouri law in such circumstances will promote certainty, predictability, and uniformity of result, factor "(f)" under § 6(2). Furthermore, factor "(g)" under § 6(2) (ease in the determination and application of the law to be applied), favors application of Missouri law.

We have not discussed factors "(a)" or "(e)" under § 6(2), as neither of them, in our view, leans toward either Missouri or New Jersey.

In sum, the factors to be taken into account under the Missouri choice of law rule for determining the substantive law to be applied in *tort* cases weigh overwhelmingly in favor of applying Missouri law to the issue whether Fulton, as a purchaser of certain Ferracute assets, can be held liable to plaintiffs for damages caused by press 17140. Plaintiffs' first point is, consequently, denied.

Plaintiffs' second (and final) assignment of error has two facets, the first of which is that Missouri, "in this case of first impression," should adopt the product line rule of corporate successor liability. The second facet is that even under Missouri's "traditional corporate successor rules," Fulton cannot escape liability, inasmuch as its mechanical press division is a "mere continuation" of Ferracute. In view of these contentions, our next task is to determine what the Missouri substantive law is in regard to corporate successor liability.

In *Tucker v. Paxson Machine Co.,* 645 F.2d 620 (8th Cir.1981), an industrial worker in St. Louis, Missouri, suffered a crushed hand in 1976 while operating a machine manufactured in 1918 by William R. Thropp & Sons Company ("Thropp"). The worker and his spouse brought a products liability action in the United States District Court, Eastern District of Missouri, against Paxson, alleging that Paxson, as a corporate successor of Thropp, was liable for the injury. The trial court dismissed the action on Paxson's motion for summary judgment. Conceding that Missouri substantive law governed the issue of Paxson's liability, the worker and his spouse appealed, claiming that the trial court erred in refusing to adopt the "product line" theory of strict liability.

In 1952, 34 years after making the machine, Thropp sold substantially all of its assets to Morey Machinery Company ("Morey"). Prior to that transaction, Morey had acquired J.M. Lehmann Company, Inc. ("Lehmann"). After the Thropp transaction, Morey sold the plant, equipment, machines, and tools of Thropp at public auction, but retained Thropp's name, patents, copyrights, drawings, trademarks, and specifications for use by Lehmann in manufacturing and selling machines.

In 1961, Lehmann ceased manufacturing, and transferred to Mullins Manufacturing Corporation ("Mullins") its inventory, machinery, work in process, drawings, patents, trademarks, jigs, fixtures, and the right to use the Lehmann and Thropp trade names. Mullins thereafter operated a Lehmann/Thropp Division and manufactured machines under the Lehmann and Thropp trade names. Lehmann changed its name

to J.M.L. Trading Corporation ("JML") and, at time of suit, had limited its active business to a real estate holding company in New York. In 1973, Mullins filed a petition for an arrangement in bankruptcy.

In 1974, Paxson acquired certain assets of the Lehmann/Thropp Division from Mullins' receiver in bankruptcy. The assets included the trade name, copyrights, patents, license agreement, customer lists, products, drawings, jigs, fixtures, customer and stock orders, and finished parts of Lehmann/Thropp Division. The purchase agreement provided that the receiver and Mullins would indemnify and hold Paxson harmless against product liability claims arising from goods manufactured by Lehmann/Thropp Division. After the transaction, 60 to 80 per cent of Lehmann/Thropp employees continued to work as employees of Paxson, including industrial workers, supervisory and office staff, engineers, and sales personnel. None of the shareholders, executives, or managing personnel of Mullins or Lehmann/Thropp Division acquired any interest in Paxson.

Paxson thereafter began manufacturing and selling various "Lehmann/Thropp" items, and used the name Thropp in its advertising.

*Tucker*, relying on *Brockmann v. O'Neill*, 565 S.W.2d 796, 798[2] (Mo.App. 1978), declared that the substantive law of Missouri on whether a corporate transferee assumes the liabilities of its transferor is as follows:

> "[W]here one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to escape liability for such debts." *Tucker*, 645 F.2d at 622.

*Tucker* took note of the "product line" theory in products liability cases, which originated in *Ray v. Alad Corp.*, 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977), and was adopted in New Jersey by *Ramirez*, 86 N.J. 332, 431 A.2d 811. *Tucker*, 645 F.2d at 623. *Tucker* also noted that other courts had, by expanding the "mere continuation" exception to the general rule, found liability against a successor corporation. *Id.* *Tucker* therefore found it necessary to determine whether Missouri would depart from its traditional rule and hold Paxson liable for its predecessors' torts on either a product line theory or a continuation theory.

The trial court in *Tucker* had reasoned that Missouri would not adopt the product line rule only two years after it had elected to follow the general rule and its well-recognized exceptions in *Brockmann*. *Tucker*, 645 F.2d at 624. As the trial court and the appellate court in *Tucker* relied on *Brockmann*, we depart momentarily from *Tucker* and examine *Brockmann*.

In that case, Royal Electric Contractors, Inc. ("Royal") was incorporated in 1961 in Missouri, and it engaged in general electrical contracting. In 1963, Raymond and Luella Brockmann lent Royal $10,000, receiving a promissory note therefor. Later in 1963, Royal ceased business, having liabilities of $140,000, and delinquent taxes of $13,000. Its assets consisted of trucks, equipment, tools, and materials. A short time later, in early 1964, Consolidated Electrical Contractors, Inc. ("Consolidated Electrical") was incorporated, and it took over performance of Royal's electrical contracting projects, and employed Royal's employees.

At the time Royal ceased doing business, it had sold its trucks and other assets to Consolidated Mechanical, Inc. ("Consolidated Mechanical"), whose major stockholder, one Hundelt, became a director of Consolidated Electrical. In exchange for Royal's assets, Hundelt had paid the $13,000 delinquent taxes owed by Royal. After the purchase of Royal's assets, Consolidated Electrical used the former Royal trucks

and equipment in the course of Consolidated Electrical's business, even though those items were owned by Consolidated Mechanical.

The Brockmanns sued Consolidated Electrical, attempting to collect the $10,000 Royal note. The trial court found that sufficient consideration had passed to validate the sale of assets by Royal to Consolidated Mechanical, and the trial court also ruled there was neither fraud nor a merger so as to subject Consolidated Electrical to liability on the Royal note.

The opinion in *Brockmann*, after stating the Missouri rule set forth *supra*, explained that the evidence demonstrated "a continuation of a prior transferring corporation." 565 S.W.2d at 798. Both Royal and Consolidated Electrical were in the business of general electrical contracting, and two individuals, O'Neill and Smith, were the directors, primary officers, and major stockholders of Royal when it became defunct. Those two were among the incorporators, directors, primary officers, and major shareholders of Consolidated Electrical at the time of its incorporation. Consolidated Electrical used the same trucks, equipment, labor force, and supervisors as had Royal, and Consolidated Electrical took over performance of Royal's contracts, giving no notice to the contractors. Moreover, no new collective bargaining agreement with the employees was made at the time of the changeover. 565 S.W.2d at 798–99. Based on that analysis, the Court of Appeals reversed the trial court and entered judgment in favor of the Brockmanns and against Consolidated Electrical.

Returning now to *Tucker*, we note that the appellate court there recognized that *Brockmann* had dealt with corporate successor liability for a note, rather than for an injury caused by an allegedly defective product. *Tucker*, 645 F.2d at 624. The opinion in *Tucker* stated, however, that there was no misinterpretation of Missouri law by the trial court there. *Id.*

In *Tucker*, the injured worker and his spouse argued that Missouri would hold Paxson liable under the "product line" rule because Missouri "has embraced an expansive view of the doctrine of strict liability." Rejecting that contention, the opinion in *Tucker* observed that Missouri's commitment to strict liability did not provide a sufficient reason to depart from the traditional rule of nonliability under the facts there. The opinion stated:

> "The imposition of liability on an asset purchaser who neither made nor controlled the manufacture of a product raises different policy issues than those raised by the imposition of strict liability on a manufacturer or seller." 645 F.2d at 625.

Commenting that the few courts which had considered the issue had reached different conclusions on whether the product line theory is consistent with the philosophy of strict liability, *Tucker* held that Missouri would not apply the product line rule in the circumstances there. *Id.* Additionally, *Tucker* held that the evidence failed to demonstrate that Paxson was a "mere continuation" of Thropp. *Id.*

We recognize, of course, that we are not bound by *Tucker's* holding that Missouri (a) will continue to apply the general rule of corporate successor liability expressed in *Brockmann*, and (b) will not follow the product line rule. *Hanch v. K.F.C. National Management Corp.*, 615 S.W.2d 28, 33[6] (Mo. banc 1981); *Kraus v. Board of Education of City of Jennings*, 492 S.W.2d 783, 784–85[2] (Mo.1973). However, we do look respectfully to *Tucker* for such aid and guidance as may be found therein. *Hanch*, 615 S.W.2d at 33.

We agree with *Tucker's* observation that imposition of liability on an asset purchaser who neither made nor controlled the manufacture of a product raises different policy issues than those raised by the imposition of strict liability on a manufacturer or seller. Indeed, at least one thorough analysis of that subject has produced the conclusion that the product line rule is inconsistent with several major policy considerations underlying the imposition of strict liability. *See:* opinion of Pearson, J., concurring in

part and dissenting in part in *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368, 389–92 (banc 1984). Justice Pearson, citing seven cases, asserts that the majority of jurisdictions which have addressed the question whether to impose strict liability on a successor corporation have expressly rejected the product line approach. 689 P.2d at 389. The fact that Missouri has adopted the rule of strict liability in tort, *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo. 1969), does not, in our view, compel the conclusion that Missouri will adopt the product line rule of corporate successor liability.

We also note that *Brockmann,* in stating the Missouri rule of corporate successor liability, relied on, among other cases, *Ingram v. Prairie Block Coal Co.,* 319 Mo. 644, 5 S.W.2d 413 (1928). Unlike *Brockmann, Ingram* was a negligence suit by an injured mine worker against the corporation he worked for at the time of his injury, and also against a corporation to which his employer had conveyed all its property soon after the injury. *Ingram,* in a detailed analysis of the evidence, held that the injured worker made a submissible case against the successor corporation on the theory that it was a mere continuation of the earlier corporation, and also on the theory that the transaction between the corporations was entered into fraudulently in order to delay or defraud creditors. 5 S.W.2d at 416–17. There is, therefore, precedent from the Supreme Court of Missouri for applying the traditional Missouri corporate successor liability rule in a *tort* case. As an intermediate appellate court, we are bound to follow the last controlling decision of the Supreme Court of Missouri. Mo. Const. art. V, § 2 (1945); *Estate of Seabaugh,* 654 S.W.2d 948, 957[4] (Mo.App. 1983).

■ Having carefully considered (a) the reasoning and result in *Tucker,* 645 F.2d 620, (b) Justice Pearson's view in *Martin,* 689 P.2d at 389–92, that the product line rule is inconsistent with several major policy considerations underlying the imposition of strict liability, and his conclusion that the majority of jurisdictions which have addressed the question whether to impose strict liability on a successor corporation have expressly rejected the product line approach, (c) the traditional Missouri corporate successor liability rule articulated in *Brockmann,* 565 S.W.2d at 798[2], and (d) the fact that the traditional Missouri rule— at least to the extent of exceptions "(3)" and "(4)" thereof—was applied by the Supreme Court of Missouri in *Ingram,* 319 Mo. 644, 5 S.W.2d 413, a *tort* case, we decline plaintiffs' invitation to apply the product line rule in determining whether Fulton can be held liable to plaintiffs in the instant case.

■ We turn now to plaintiffs' contention that Fulton should be held liable because its mechanical press division is a "mere continuation" of Ferracute. Liability under that theory would be based on exception "(3)" of the traditional Missouri corporate successor liability rule. *Brockmann,* 565 S.W.2d at 798[2].

Plaintiffs argue that Fulton purchased the Ferracute mechanical press and hydraulic press lines to take advantage of the goodwill of those ongoing product lines. Fulton obtained Ferracute's records identifying purchasers of presses manufactured by Ferracute, and Fulton continued to service Ferracute-manufactured presses and sell parts for them. Additionally, say plaintiffs, Fulton, through its advertising, attracted new clients by the established reputation and continuity of the Ferracute business.

Fulton, on the other hand, argues that it cannot be held liable under the traditional Missouri rule because the threshold requirement of that rule is that the purchasing corporation acquire *all* of the assets of the selling corporation. Fulton reminds us that only a portion of Ferracute's assets were transferred to Fulton, and that Ferracute retained its office building, production plant, pattern shop, 10 acres of real estate, a broad range of machine tools, and its office furniture and equipment.

Furthermore, says Fulton, Ferracute, after becoming Bridgeton, remained in business over a year, manufacturing and selling about a half million dollars' worth of machines. When Bridgeton liquidated, its remaining assets were sold to sundry purchasers, none of whom was Fulton. Fulton also reminds us that there were no common incorporators, directors, officers, or shareholders between Fulton and Ferracute, and that of the 40 to 50 Ferracute employees, only one transferred to Fulton at the time of the 1968 asset purchase agreement.

It is also noteworthy, it seems to us, that Fulton was not created to acquire Ferracute's mechanical press and hydraulic press lines. Fulton had been in other lines of business for some 116 years before the 1968 transaction with Ferracute.

Measuring the evidence in the instant case by *Brockmann* and *Ingram,* we hold that, as a matter of law, Fulton, in the 1968 asset purchase agreement with Ferracute, did not become a "mere continuation" of Ferracute. To hold otherwise would, as we see it, amount to a *sub silentio* adoption of the product line rule of corporate successor liability.

Plaintiffs do not contend that Fulton can be held liable to them under any of the other exceptions to the traditional Missouri corporate successor liability rule. Accordingly, plaintiffs' second point is denied, and the judgment is affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.