Orvil HACK and Shirley
Hack, Plaintiffs,

v.

H.V.R. PARTS, INC., t/d/b/a H.V.R.
Machine Tools, Defendants.

Civ. A. No. 89–321.

United States District Court,
W.D. Pennsylvania.

July 31, 1990.

Paul L. Hammer, Pittsburgh, Pa., for plaintiffs.

Stephen M. Houghton, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

D. BROOKS SMITH, District Judge.

On February 16, 1987, plaintiff Shirley Hack was operating a punch press allegedly manufactured by Havir Manufacturing Company which malfunctioned and amputated both of her thumbs. On February 15, 1989, plaintiffs filed a complaint against

defendant H.V.R. Parts, Inc., doing business under the name H.V.R. Machine Tools, alleging that H.V.R. Parts is liable for Mrs. Hack's injuries, apparently on a products liability theory.[1]

It is not disputed that H.V.R. Parts did not manufacture or ship the punch press which injured Mrs. Hack; in fact, H.V.R. Parts' first business relationship with the Elco Corporation, Mrs. Hack's employer, does not appear to have taken place until after the injury, in March 1987, when H.V.R. Parts shipped some replacement parts for a punch press to Elco Corporation in Huntingdon, Pennsylvania. See Exhibit "D" to Defendant's Motion for Summary Judgment. Plaintiff contends rather that the defendant H.V.R. Parts is liable as the successor to the product line of Havir Manufacturing Company. H.V.R. Parts has moved for summary judgment, asserting that the product line doctrine is inapplicable and that it is not the successor to Havir Manufacturing.

▬ The product line doctrine is a judicially created exception to the general rule that a successor corporation does not acquire future contingent liabilities by its succession to a transferor corporation's assets. See *e.g. Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 341 A.2d 174 (1975). The highest courts of three states—California, New Jersey, and Washington—have adopted the doctrine. See *Conway v. White Trucks*, 885 F.2d 90, 94–95 (3d Cir. 1989). A panel of the Pennsylvania Superior Court, speaking through Judge Spaeth in *Dawejko v. Jorgensen Steel Company*, 290 Pa.Super. 15, 434 A.2d 106, 110–11 (1981), adopted New Jersey's formulation of the doctrine:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

(quoting *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 358, 431 A.2d 811, 825 (1981)).

The *Dawejko* court further stated that in deciding whether successor liability should be imposed, the California Supreme Court's three part inquiry introduced by *Ray v. Alad Corporation*, 19 Cal.3d 22, 30–31, 136 Cal.Rptr. 574, 579–80, 560 P.2d 3, 8–9 (1977) should be considered:

> (1) [was] the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) [what is] the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) [what is] the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

See 290 Pa.Super. at 26, 434 A.2d at 111.

In ruling on a motion for summary judgment, we must consider the evidence presented through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Therefore, the plaintiffs must make a showing sufficient to establish the existence of successor liability under the *Dawejko* test (which we treat as the best statement of the law of Pennsylvania in the absence of a pronouncement from its legislature or Supreme Court, see *Vargus v. Pitman Manufacturing Co.*, 675 F.2d 73, 76 (3d Cir.1982)), or face summary judgment. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.")

---

1. The complaint in pertinent part states only that the punch press malfunctioned, and contains no allegation that the punch press was defective or unreasonably dangerous in the condition in which it was sold or shipped by Havir Manufacturing or H.V.R. Parts. See Restatement (2d) of Torts, § 402A.

■ The defendant has presented evidence which tends to show the following:

1. On April 29, 1977, Terry P. Duggins, the president of defendant H.V.R. Parts, purchased assets from a trustee in liquidation of the Havir Manufacturing Company. That same day, Duggins sold the assets to Kansas Leveraged Properties, Ltd., a corporation which Duggins solely owned. (Duggins Affidavit; Tr. 19–20)

2. On May 6, 1977, Kansas Leveraged Properties sold the assets, consisting of used office equipment and punch press equipment and replacement parts, to H.V.R. Parts, Inc., a corporation incorporated by Duggins and the stock of which is and has always been 100% owned by Duggins or by Kansas Leveraged Properties. (Duggins Affidavit; Tr. 14–15)

3. Havir Manufacturing did not go out of business upon the sale of assets to Duggins. It remained in the business of manufacturing punch presses until approximately 1980, and continued to purchase parts from H.V.R. Parts. (Tr. 132–33) In the early 1980's, H.V.R. Parts commissioned an advertising brochure which represented that Havir Manufacturing had "ceased operations and closed in November, 1977." (Deposition Exhibit at 13) Duggins believed that the brochure was recalled and corrected before mailing by deleting this claim, but at least one of the brochures was mailed out in 1987. (Tr. 53–66, 86–87)

4. Havir Manufacturing was in the business of manufacturing and sale of punch presses. It had approximately eighty-five employees. (Tr. 80) H.V.R. Parts primarily sells replacement parts for punch presses, but will assemble a complete unit if requested, a service which H.V.R. Parts has offered since approximately 1980. (Tr. 34) H.V.R. Parts manufactures and ships between twelve and thirty completely assembled units each year. (Tr. 169, 171) It has four employees. (Tr. 32)

5. H.V.R. Parts did not purchase Havir Manufacturing's product line and although it apparently intended to purchase Havir Manufacturing's manufacturing equipment, did not receive all of that equipment. (Tr. 26–29, 145–46, 150–59). Nor did H.V.R. Parts receive Havir Manufacturing's customer lists. (Tr. 158–60) None of the management, officers, or stockholders of Havir Manufacturing have ever been connected with H.V.R. Parts. (Tr. 78–79)

6. The name H.V.R. Parts was chosen because Duggins had received in the equipment purchased from Havir Manufacturing some metal castings with "Havir" imprinted on them. Upon advice from an engineer who stated that grinding off the entire name would weaken the castings, Duggins took off the vowels, and chose the name High Valve Replacement Parts to make use of the H.V.R. logo remaining. (Tr. 87–89)

7. Kurt Manufacturing, a Minneapolis company partially owned by stockholders in Havir Manufacturing, manufactured presses for Havir Manufacturing from approximately 1975 until 1981. (Tr. 133–36, 140–43)

Based on this evidence submitted, H.V.R. Parts has made a substantial showing that H.V.R. Parts is not the successor to Havir Manufacturing. Further, the holding in *Conway v. White Trucks*, supra, would also negate successor liability even if H.V.R. Parts were somehow deemed to be a successor:

> [W]e predict that the Pennsylvania Supreme Court, if it were to adopt the product line exception, would require the virtual destruction of the plaintiff's remedies against the original manufacturer *caused by* the successor's acquisition. 885 F.2d at 97 (emphasis added)

Havir Manufacturing continued in business according to Duggins at least until 1980 or 1981, and was succeeded, insofar as production of punch presses is concerned, by Kurt Manufacturing. Even if Duggins is disbelieved, and his explanation regarding the erroneous advertising brochure is disbelieved, the earliest date of record for the cessation of business by Havir Manufacturing is November 1977, six months after H.V.R.'s purchase of some of the assets of Havir Manufacturing. In light of

this, and in light of the retention by Havir Manufacturing or Kurt Manufacturing of punch presses and punch press manufacturing equipment for at least several years after the sale to Duggins, (Tr. 29, 135–36) no reasonable finder of fact could conclude that the termination of Havir Manufacturing, if it took place, was caused by the sale of assets to Duggins.

In opposition to the motion for summary judgment, plaintiff filed (some months late and after notice from this judge's office staff) an Affidavit Opposing Defendant's Motion for Summary Judgment, consisting of an affidavit signed by the plaintiffs' attorney which contains the following:

1. A reference to the language in the H.V.R. Parts advertising brochure (Duggins Deposition Exhibit) regarding the availability from H.V.R. Parts of Press–Rite presses formerly manufactured by Havir Manufacturing Company, and to the claim that Havir Manufacturing ceased operations in November, 1977.

2. The plaintiffs' attorney's references to portions of Duggins' deposition in which Duggins authenticated the parts brochure and the exhibits to the Duggins Affidavit, and admitted that H.V.R. Parts shipped replacement parts to the Elco Corporation in March, 1987, that H.V.R. Parts assembled complete punch presses in 1988 and 1989, and that Duggins controlled Kansas Leveraged Properties and H.V.R. Parts, Inc.

3. The plaintiffs' attorney's representation that at trial, plaintiffs would call Bert Gross (not identified, but known from examining the Duggins deposition as the liquidating trustee of Havir Manufacturing) who would testify that H.V.R. Parts did receive all of Havir Manufacturing's manufacturing equipment and does engage in the sale of Press–Rite presses.

4. The opinion of plaintiffs' attorney that all of Duggins' statements are admissible, and plaintiff's attorney's averment that H.V.R. Parts is in the business of manufacturing Press–Rite punch presses and that Havir Manufacturing was liquidated in the late 1970's.

■ In responding to a summary judgment motion

> an opposing affidavit must set forth such facts as would be admissible in evidence and must show that affiant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e).

*Hurd v. Williams*, 755 F.2d 306, 308 (3d Cir.1985). The affidavit must be based on personal knowledge and not on the hearsay statement of another purported witness. See *Sellers v. M. C. Floor Crafter, Inc.*, 842 F.2d 639, 643 (2d Cir.1988) (defendant's counsel's affidavit that based on information conveyed to him plaintiff failed to exhaust his union grievance procedures would be insufficient to establish that plaintiff had failed to exhaust grievance procedures). Plaintiffs' counsel's recitation of what Bert Gross would testify to concerning H.V.R. Parts' business is inadmissible as hearsay, even if we were to overlook the lack of a stated basis for Gross' knowledge.

■ Secondly, an affidavit which merely contains counsel's conclusions as to the legal merits of his clients' case is completely inadequate, where that affidavit fails to set forth the basis for that opinion. *Hurd v. Williams*, supra. See also *Maldonado v. Ramirez*, 757 F.2d 48 (3d Cir.1985). Plaintiffs' counsel's conclusions that H.V.R. Parts is in the business of making Press–Rite presses and that Havir Manufacturing ceased operations in the late 1970's lack a basis for counsel's statement of those conclusions. We note further that even accepting as true counsel's assertion that H.V.R. Parts is in the business of manufacturing Press–Rite presses does not suffice to create an issue of fact precluding summary judgment. Duggins testified that H.V.R. Parts had manufactured and assembled completed presses after 1980 or 1981, after a full complement of manufacturing equipment was produced. (Tr. 34, 153–56) This does not establish that H.V.R. Parts is the continuation of Havir Manufacturing, but only that H.V.R. Parts sells some of the same products that Havir Manufacturing had.

Summary judgment shall be entered for the defendant.