**Terrence Wayne LaFOUNTAIN**

v.

**WEBB  INDUSTRIES  CORPORATION, and Lloyd H. Knost, Individually, and Lloyd H. Knost, t/a Reed Engineering Company, and Ted Reed, Individually and t/a Reed Engineering Co.**

**Civ. A. No. 89–6069.**

United States District Court, E.D. Pennsylvania.

March 5, 1991.

John A. Beranbaum, Galfand, Berger, Lurie & March, Philadelphia, Pa., for plaintiff.

Thomas P. Wagner, Judith A. Schneider, Rawle & Henderson, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, Senior District Judge.

Plaintiff, Terrence Wayne LaFountain (LaFountain), was injured on January 11, 1988 while operating a pinch-type roll bender machine at his place of employment. He filed this diversity action on August 18, 1989. The amended complaint contains three counts, alleging negligence, strict liability, and breach of warranty. On March

5, 1990, the claims against defendant Lloyd Knost (Knost) were dismissed for lack of personal jurisdiction. Memorandum Opinion and Order of March 5, 1990. Defendant Webb Industries Corporation (correctly named "The Webb Corporation," and hereinafter referred to as "Webb") has filed a motion for summary judgment. LaFountain has filed a motion to extend the time in which the parties may conduct discovery. For the reasons discussed herein, I will grant the motion for summary judgment and deny the motion to extend discovery.

## I. FACTS

The roll bender machine in question, Model 608 Bending Machine Serial No. 649, was designed and manufactured by the Reed Engineering Company of Carthage Missouri (Reed). Amended Complaint at ¶ 6. The machine was sold by Reed to LaFountain's employer, Hauck Manufacturing Company (Hauck), then located in Brooklyn, New York, in 1949. Amended Complaint at ¶ 6; Defendant's Motion, Exhibit B (shop order). In 1964 Hauck moved its plant, including the machine in question, to its present location in Cleona, Pennsylvania. Deposition of Arthur Kapp, Jr. (Kapp Deposition) at 14–15. At the time of the sale, Reed was a partnership operated by Knost and Ted Reed.[1] In 1950, Knost purchased Ted Reed's interest in the partnership. Affidavit of Lloyd H. Knost (Knost Affidavit) at ¶ 2. Knost continued to operate as an individual under the name Reed Engineering Company until 1952, when he organized a Missouri corporation under the same name (Reed Corporation). *Id.* Knost and his wife were the principal owners of the corporation. *Id.*

Webb had no part in the design, manufacture, sale or shipment of the roll bender machine at issue. Affidavit of John Bentley (Bentley Affidavit) at 2–3. At the time of the manufacture and sale of the machine, Webb had no relationship with Reed or Reed Corporation. *Id.* On April 15, 1954, Webb entered into a licensing agreement with Knost, which gave Webb the exclusive right to manufacture certain products formerly manufactured by Reed and Reed Corporation, including roll bender machines of the type involved in this accident, for a period of five years. Defendant's Motion, Exhibit F (1954 Contract). Under the terms of the contract, Webb obtained exclusive rights to patents and patents pending, trademarks, goodwill, designs and drawings, jigs and fixtures and customer records necessary for the manufacture of the products covered by the agreement; however, all prints, designs, jigs, fixtures and related materials transferred to Webb, were to remain the property of Knost. *Id.* The contract also provided that products manufactured and sold by Webb were to bear a nameplate with the wording "Reed Engineering Division of the Webb Corporation" or "a product of the Reed Engineering Company, built by the Webb Corporation." *Id.*

On May 10, 1954, Reed Corporation filed Articles of Dissolution with the Missouri Secretary of State, and the company was dissolved in 1955. Exhibits to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Plaintiff's Memo), Articles of Dissolution; Knost Affidavit at ¶ 6. Following the dissolution of Reed Corporation, Knost continued to do business individually as L.H. Knost Company. Knost Affidavit at ¶ 8. After entering into the 1954 contract with Webb, neither Reed Corporation nor Knost individually, manufactured or sold any pinch-type roll bender machines. *Id.* at ¶ 5.

Webb entered into a second contract with Knost on February 10, 1959. Under the terms of the second contract, Webb purchased the manufacturing rights to the products which were the subject of the 1954 licensing agreement, along with the goodwill and all jigs, fixtures, patterns, designs, drawings, trademarks, patents and patents pending necessary for manufacture of the Reed product line. Defendant's Motion, Exhibit G (1959 Contract). In consideration for the sale, Webb agreed to pay Knost a certain percentage of its gross sales price on all orders received from

---

**1.** Defendant Ted Reed is now deceased. No claim has been brought against his estate.

April 1, 1959 to and including December 31, 1973. *Id.* Webb has continued to manufacture products covered by the 1959 Contract to the present date. Deposition of Robert Howard (Howard deposition) at 14–15.

## II. DISCUSSION

### A. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment should be entered if "there is no genuine issue as to any material fact and [the] moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. In ruling on a motion for summary judgment, the court must consider the evidence in the light most favorable to the non-moving party, *Baker v. Lukens Steel Co.,* 793 F.2d 509, 511 (3d Cir.1986); however, the non-moving party must present some "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511.

### B. Successor Liability

LaFountain contends that Webb is strictly liable for his injuries as a corporate successor to Reed, the company that designed and manufactured the allegedly unsafe machine. As this is a diversity case, the law of the forum state, Pennsylvania, controls. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The general rule under Pennsylvania law is that " 'when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets.' " *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 308 (3d Cir.), *cert denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985) (quoting *McClinton v. Rockford Punch Press & Manufacturing Company,* 549 F.Supp. 835, 837 (E.D.Pa. 1982). Exceptions to the general rule exist where "(1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability." *Conway v. White Trucks, A Div. of White Motor Corp.,* 885 F.2d 90, 93 (3d Cir.1989) (quoting *Husak v. Berkel, Inc.,* 234 Pa.Super. 452, 456, 341 A.2d 174, 176 (1975)). Some decisions have also stated that an exception exists where "the transfer was made without adequate consideration and provisions were not made for creditors of the transferor." *Philadelphia Electric Co.* at 309.

Plaintiff does not contend that the relationship between Webb and Reed falls within one of these exceptions, but rather that Webb is liable as a successor under the so-called "product line doctrine." In *Dawejko v. Jorgensen Steel Co.,* 290 Pa. Super. 15, 434 A.2d 106 (1981) the Pennsylvania Superior Court opined that "in cases of strict liability the general rule [of non-liability for successor corporations] seems to lead to an unjust result" and it therefore followed the lead of the California and New Jersey courts in adopting the product line exception to the general rule.

■ The product line exception has been adopted by a minority of jurisdictions.[2] The doctrine is based on "the social policies underlying strict products liability," *Ra-*

---

2. The Supreme Courts of California, New Jersey and Washington have adopted the exception. *See Ray v. Alad Corporation,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977); *Ramirez v.* *Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981); *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368 (1984).

*mirez, supra,* 86 N.J. at 358, 431 A.2d at 825; namely, the "protecting of the otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them." *Ray, supra,* 19 Cal.3d at 30–31, 136 Cal. Rptr. at 579, 560 P.2d at 8–9 (quoting *Price v. Shell Oil Co.,* 2 Cal.3d 245, 251, 85 Cal.Rptr. 178, 181, 466 P.2d 722, 725 (1970)). Under the exception, in certain circumstances, a successor corporation that continues to manufacture a predecessor's product line will be held liable for injuries resulting from the predecessor's defective products.

The *Dawejko* court specifically adopted the New Jersey Supreme Court's formulation of the exception which states:

> where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko,* 290 Pa.Super. at 23, 434 A.2d at 110 (quoting *Ramirez, supra,* 86 N.J. at 358, 431 A.2d at 825). In adopting the exception, the court also stated:

> it is better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation. The various factors identified in [other cases involving successor liability] will always be pertinent—for example, whether the successor corporation advertised itself as an ongoing enterprise, *Cyr v. B. Offen & Co.* [501 F.2d 1145 (1st Cir.1974)], *supra;* or whether it maintained the same product name, personnel, property and clients, *Turner v. Bituminous Casualty Co.* [397 Mich. 406, 244 N.W.2d 873 (1976)], *supra,* or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve, *Knapp v. North*

*American Rockwell Corp.* [506 F.2d 361 (3rd Cir.1974)], *supra.* Also it will always be useful to consider whether the three-part test stated in *Ray v. Alad Corp., supra,* has been met.

*Id.* 290 Pa.Super. at 26, 434 A.2d at 111. The three-part test to which the court refers provides that:

> [j]ustification for imposing strict liability upon a *successor* to a manufacturer … rests upon (1) the virtual destruction of the plaintiff's remedies caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Ray v. Alad Corp.,* 19 Cal.3d at 31, 136 Cal.Rptr. at 579–80, 560 P.2d at 8–9 (emphasis in original).

■ The Pennsylvania Supreme Court has not yet addressed the product line exception set forth in *Dawejko;* however, federal courts in this circuit have proceeded under the assumption that the Pennsylvania Supreme Court would adopt such an exception. *See Conway v. White Trucks, A Div. of White Motor Corp.,* 885 F.2d at 95; *Tracey by Tracey v. Winchester Repeating Arms Co.,* 745 F.Supp. 1099, 1105 (E.D.Pa.1990), *aff'd without opinion,* 928 F.2d 397 (3d Cir.1991); *Hack v. H.V.R. Parts, Inc.,* 742 F.Supp. 283, 285 (W.D.Pa. 1990), *aff'd without opinion,* 925 F.2d 417 (3d Cir.1991); *Whitmore v. Bobst Group, Inc.,* 668 F.Supp. 421, 429 (E.D.Pa.1987); *Shorb by Shorb v. Airco, Inc.* 644 F.Supp. 923, 928 (E.D.Pa.1986); *Turner v. Mudrick Machine Works,* 589 F.Supp. 771, 775 (E.D. Pa.1984); *McClinton v. Rockford Punch Press Manufacturing Co., Inc.,* 549 F.Supp. 835, 837 n. 1 (E.D.Pa.1982); *Amader v. Pittsburgh Corning Corp.,* 546 F.Supp. 1033, 1036 (E.D.Pa.1982). *See also Reed v. Armstrong Cork Co.,* 577 F.Supp. 246, 251 (E.D.Ark.1983) (applying Pennsylvania law). For purposes of this decision, I

will therefore also assume that the Pennsylvania Supreme Court would adopt the product line exception.

Both LaFountain and Webb devote substantial portions of their briefs in this matter to the question of whether the loss of a plaintiff's remedies against the original manufacturer must have been caused by the successor's acquisition of the business in order for the product line exception to apply. Webb argues that the causation element is a prerequisite to the imposition of successor liability under the doctrine and that because its acquisition of the Reed product line did not cause the dissolution of Reed and plaintiff's loss of remedies, it cannot be held liable under the doctrine. LaFountain contends that causation is not required, and that even if it is, there is at least a factual question as to causation so as to preclude the entry of summary judgment on the issue.

The weight of the authority favors Webb's position. In *Conway, supra,* the Third Circuit Court of Appeals stated that "[w]e predict that the Pennsylvania Supreme Court, if it were to adopt the product line exception, would require the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition." *Id.,* 885 F.2d at 97. Although, as LaFountain points out, this statement is technically dictum because the court in *Conway* found that the plaintiff continued to have a remedy available against the original manufacturer after the acquisition but failed to assert it; nonetheless, the reasoning of the court is persuasive. As the *Conway* court noted, almost every court that has addressed the issue has "emphasized" the "requirement that the asset transfer must have caused the destruction of plaintiff's remedy." *Id.,* at 95. *See Santa Maria v. Owens–Illinois, Inc.,* 808 F.2d 848, 859 (1st Cir.1986); *Nelson v. Tiffany Industries, Inc.,* 778 F.2d 533, 538 (9th Cir.1985); *Kline v. Johns–Manville,* 745 F.2d 1217, 1220 (9th Cir.1984); *Tracey by Tracey v. Winchester Repeating Arms Co.,* 745 F.Supp. at 1108; *Hack v. H.V.R. Parts, Inc.,* 742 F.Supp. at 285; *In re Related Asbestos Cases,* 578 F.Supp. 91, 92 (N.D. Cal.1983); *Hall v. Armstrong Cork, Inc.,* 103 Wash.2d 258, 692 P.2d 787, 791 (1984); *Ray v. Alad Corp.,* 19 Cal.3d at 31, 136 Cal.Rptr. at 580, 560 P.2d at 9. As the court in *Tracey* noted, the causation element has been emphasized because "in order for the product line exception to be consistent with the policies which underlie strict liability in tort... the conduct of the successor corporation must have some reasonable connection with the claimant's injuries." *Id.,* 745 F.Supp. at 1108.

I need not decide, however, whether the causation element is a prerequisite to liability under the product line doctrine, because an examination of the record reveals that LaFountain continues to have a remedy available against the original manufacturer. As was outlined above, the roll bender machine involved in the accident was manufactured by the Reed *partnership* and sold to Hauck in 1949. In 1950, Knost purchased his partner's interest in the business and continued to operate as an individual until 1952 when he organized a Missouri corporation of the same name. However, the assets which Webb later purchased were apparently never conveyed to the corporation but continued to be owned by Knost individually. The 1954 licensing agreement states that *Knost* was "the rightful owner of certain drawings, designs, patents, patents pending, goodwill trade marks, cost records, sales records and related information connected with products heretofore sold under the trade name 'Reed' or 'Reed Engineering Company.'" It further stated that Knost was canceling "his personal manufacturing agreement with Reed Engineering Company, a Missouri Corporation" and assigning an "exclusive license agreement for the manufacture of said 'Reed' products" to Webb. Webb then purchased these assets and rights from *Knost* in the 1959 contract. Webb cannot be the corporate successor of the Reed *Corporation,* because the Reed Corporation was not a party to either contract and Webb never purchased anything from Reed, or anything that the Reed Corporation ever owned.

■ Moreover, the issue of whether Webb is a successor of the Reed Corporation or whether the 1954 licensing agreement in some way brought about the dissolution of the corporation and therefore destroyed future plaintiffs' remedies against the corporation is irrelevant to the question of Webb's liabilities to LaFountain, because it does not appear that LaFountain could have had any claims against the Reed Corporation. The machine that injured LaFountain was manufactured by the Reed *partnership*. Knost succeeded to the rights of the partnership when he purchased the interest of Ted Reed. The contracts between Knost and Webb reveal that Knost did not transfer the right to manufacture the Reed product line to the Reed Corporation, but rather entered into a personal manufacturing agreement with the corporation. Thus, the Reed Corporation never assumed the rights and liabilities of the Reed partnership with respect to the Reed product line and the dissolution of the corporation does not affect the remedies available to LaFountain with respect to Knost, regardless of whether it was brought about in some way by the 1954 contract between Webb and Knost.

■ LaFountain claims that he has no effective remedy against the Reed company or Knost because of the dissolution. He argues that under the Missouri corporate survival statute, claims against a dissolved corporation and its directors and shareholders must be instituted within two years of the date of dissolution. Mo.Rev.Stat. § 351.565. This argument is based, however, on a misleading characterization of the nature of LaFountain's claim. As was discussed above, his claim is not against the dissolved corporation, but against the Reed partnership and Knost individually. LaFountain's claims against Knost are not based on his position as a shareholder or director of the Reed Corporation, and the statute is thus not applicable.

■ Webb may very well be the successor of the Reed *partnership* by virtue of its purchase of the right to manufacture the Reed product line from Knost; however, the Third Circuit has explicitly predicted that the Pennsylvania Supreme Court, if it adopted the product line exception at all, would require as a prerequisite, that the plaintiff have no available remedy against the predecessor. *Conway*, 885 F.2d at 96. The exception is based on the principle of shifting the risk of loss from the victim to the successor who is in a better position to insure against injuries resulting from defective products. As the *Conway* court noted:

> If a remedy against the original manufacturer [is] available, however, the consumer has not been obliged to bear the risk and the justification for imposing successor liability evaporates. Thus as a logical matter, the loss of a remedy against the original manufacturer must be a prerequisite to the invocation of the product line exception. Otherwise the exception would in effect swallow the general rule of successor nonliability.

*Id.* at 95. Although the Reed partnership ceased to exist when Knost purchased the interest of Ted Reed, Knost remains liable for claims against the partnership.[3] Because LaFountain has a remedy against the original manufacturer, the product line exception to the general rule of successor nonliability is not applicable and Webb is therefore entitled to summary judgment on LaFountain's strict products liability claims.

### C. Duty to Warn

LaFountain argues that even if Webb is not a successor to Reed for purposes of strict liability, it is liable on independent negligence grounds. According to LaFoun-

---

**3.** Under Pennsylvania and Missouri law, a partner is individually liable for wrongs committed by the partnership. 15 Pa.Cons.Stat.Ann. § 8327; Mo.Rev.Stat. § 358.150; *Smith v. Wohl,* 702 S.W.2d 905, 910 (Mo.App.1985). Also, under the law of both states, partners remain liable for debts of the partnership after dissolution of the partnership. 15 Pa.Cons.Stat.Ann. § 8358; Mo.Rev.Stat. § 358.360; *Fenix v. Celebrezze,* 243 F.Supp. 816, 823 (D.Mo.1965). Knost was in fact sued in his individual capacity in this action. The claims against him were dismissed for lack of personal jurisdiction. Memorandum Opinion and Order of March 5, 1990. Knost would, however, be amenable to suit in Missouri.

tain, Webb had a duty to warn LaFountain's employer, Hauck, of the defective and unsafe nature of the machine that caused the injury.

The Pennsylvania courts have not addressed the issue of whether a successor corporation may be held liable for failing to warn of defects in its predecessor's products. The courts of a number of other jurisdictions, however, have held that under appropriate circumstances, the successor may be held liable under a failure to warn theory. *See Tracey by Tracey v. Winchester Repeating Arms Co.*, 745 F.Supp. at 1111 n. 22 (collecting cases). It is not the fact of succession alone, however, that gives rise to a duty to warn the customers of the predecessor of product defects, but rather the "establishment of a relationship with the customer that imposed certain duties and responsibilities." *Polius v. Clark Equipment Company*, 802 F.2d 75, 84 (3d Cir.1986). *Accord, Florom v. Elliot Manufacturing*, 867 F.2d 570, 577 (10th Cir.1989); *Mozingo v. Correct Manufacturing Corp.*, 752 F.2d 168, 752 (5th Cir.1985); *Travis v. Harris Corp.*, 565 F.2d 443, 448–49 (7th Cir.1977); *Tracey*, 745 F.Supp. at 1111; *Wessinger v. Vetter Corp.*, 685 F.Supp. 769, 774 (D.Kan.1987). "The mere continuation of a name and acquisition of good will cannot of themselves create a duty to warn." *Travis*, at 448. In general, "such a duty has been imposed where the relationship is of some actual or potential economic benefit to the defendant, and the expected benefit justifies the requirement of special obligations." *Schumacher v. Richards Shear Company*, 59 N.Y.2d 239, 247, 451 N.E.2d 195, 199, 464 N.Y.S.2d 437, 441 (1983). (quoting Prosser, *Torts* [4th ed.], § 56, p. 339). *See also, Gee v. Tenneco, Inc.*, 615 F.2d 857, 866 (9th Cir.1980) (rationale for imposing duty to warn on successor corporation "is consistent with a benefit/burden analysis").

■ Courts have looked to a number of factors in determining whether an ongoing relationship exists between the successor corporation and the customers of the predecessor, such that liability for failure to warn can be imposed. Important factors include: "succession to service contracts, coverage of the particular machine by contract, service of that machine by the successor, and the successor's knowledge of the defect and of the machine owner's location." *Florom*, 867 F.2d 570; *Accord, Polius*, 802 F.2d at 84; *Mozingo*, 752 F.2d at 177; *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 626 (8th Cir.1981); *Travis*, 565 F.2d at 449; *Leannais v. Cincinnati Inc.*, 565 F.2d 437, 442 (7th Cir.1977); *Tracey*, 745 F.Supp. at 1111–1112.

*Tracey, supra,* appears to be the only decision that considers the liability of corporate successors for failure to warn of defects in the predecessor's products in the context of Pennsylvania law. In that opinion, Judge O'Neill predicted that if the Pennsylvania Supreme Court were to adopt the failure to warn theory, it would also adopt the factors listed above as providing the proper analytical framework. *Id.* at 1112. I join in that prediction. When the facts of the instant case are considered in light of those factors, it is clear that even if Pennsylvania were to adopt the theory, LaFountain could not establish liability, and therefore, Webb is also entitled to summary judgment on the failure to warn claims.

■ In establishing liability for a successor corporation's failure to warn of defects in predecessor's products, courts "have emphasized that the relationship which gives rise to this duty is between the successor corporation and the *particular* allegedly defective product." *Tracey*, 745 F.Supp. at 1112 (emphasis in original). In *Tucker v. Paxson Machine Co., supra,* the Eighth Circuit Court of Appeals upheld a grant of summary judgment where there was no evidence that the successor corporation inherited any service contracts, inspected, serviced or performed any work on the allegedly defective machine, but had serviced other machines owned by the plaintiff's employer. *Id.,* 645 F.2d at 626. In so ruling, the court stated that "the bare assertion that [the successor] knew of the defective nature of the ... machine and of its location ... does not show the necessary 'relationship between the successor and the customers of the predecessor.' "

*Id.* at 627 (quoting *Gee v. Tenneco, Inc.*, 615 F.2d at 866. Similarly, in *Tracey*, the defendant was granted summary judgment where there was no evidence that the defective product was ever the subject of any service contracts or that the defendant ever performed any work on the product in question. *Id.*, 745 F.2d at 1112–13.

LaFountain points to the fact that Webb was aware of other accidents involving roll bending machines and that Webb notified its post–1954 customers of the availability of safety features and mailed them warning labels to affix to the machines as bases for imposing a duty to warn on Webb. *See* Bentley deposition at 40, 50, 55, 93; Howard deposition at 63. However, the other factors necessary for such a duty do not exist in this case. Webb did not succeed to any service contracts as a result of either the 1954 contract or the 1959 contract, and it is clear that the machine in question was not covered by any service contract.[4] Webb did sell replacement parts for machines it sold and machines manufactured and sold by Reed, but according to the uncontroverted deposition testimony of Robert Howard, secretary and treasurer of Webb, Webb never solicited business from former Reed customers for the sale of replacement parts, Howard Deposition at 44, and there is no evidence that Webb ever did undertake any such solicitation.

The only evidence of any relationship between Webb and the allegedly defective machine is that on two occasions, Hauck ordered replacement parts for the machine from Webb. The first of these sales occurred in 1973 and the second in 1980. Exhibits to Plaintiff's Memo, Replacement Part Order 1973, Replacement Part Order 1980. There is no evidence that Webb in any way solicited these particular replacement orders. The general foreman of Hauck testified at his deposition that Hauck initially contacted Webb to inquire if Webb had the replacement parts available. Kapp Deposition at 77. Representatives of both Webb and Hauck testified at deposition that no one from Webb ever visited the Hauck plants in Brooklyn or Pennsylvania, nor has Webb ever inspected or performed any work on any of Hauck's machines, including the machine in question. Howard deposition at 81, Kapp deposition at 28.

In light of these facts, I cannot conclude that a relationship that would give rise to a duty to warn existed between Webb and Hauck. The only contacts between the two companies in the forty year span between the time Hauck purchased the machine and the time LaFountain was injured, were the two isolated sales of replacement parts, the first of which occurred nineteen years after Webb acquired the Reed product line and twenty-four years after the machine was sold. The sum total of those sales amounted to $248.48. In the absence of any other evidence of an ongoing relationship between the two companies, this can hardly be characterized as an economic benefit that warrants the imposition of a duty to warn on Webb. I will therefore follow *Tucker* and *Tracey* in concluding that the facts that Webb may have known of the alleged defects in roll bender machines and may have known of the location of this particular machine's owner are not enough to impose a duty to warn in this case. *Tucker* at 626; *Tracey;* at 1113.

■ Because I am granting Webb's motion for summary judgment, I will deny LaFountain's motion to extend the dis-

---

4. LaFountain argues that the following provision of the 1954 contract amounts to the assumption by Webb of servicing responsibilities for machines manufactured before the transfer:

Party of the first part [Knost] agrees to assume any and all products liability resulting from machines manufactured prior to the date of this agreement in excess of $100.00. Any lessor [sic] amount shall be assumed by party of the second part [Webb] as a matter of everyday business routine. The above amount shall cover materials or part labor only and shall not include travel expenses nor wages of service man. Party of the second part shall sell to first party any necessary repair parts at cost to permit the handling of such product liabilities as mentioned above. At most, this provision, which is not contained in the 1959 contract, made Webb responsible for minor repairs or expenses arising from machines manufactured before 1954. It does not transfer any general servicing responsibilities to Webb, nor can it be characterized as a transfer of service contracts.

covery deadline as moot. The additional discovery LaFountain seeks includes the deposition of the Webb official responsible for designing safety features, the deposition of Webb's product liability insurance carrier, the production of records pertaining to Webb's distribution of safety warnings, and the production of records relating to Webb's knowledge of claims similar to the one involved in this case. Plaintiff's Motion to Extend the Discovery Deadline at ¶ 6. The additional discovery would not preclude summary judgment, as it does not seek facts related to either Webb's role as a successor corporation or to the relationship between Webb and Hauck.